**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-392 (RCL)** |
| **ERIK SCOTT WARNER,** **FELIPE ANTONIO "TONY" MARTINEZ,** **DEREK KINNISON, and** **RONALD MELE,** | |
| **Defendants.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Erik Warner, Tony Martinez, Derek Kinnison, and Ronald Mele conspired together, and with others, to disrupt the peaceful transfer of power. They loaded up a van with weapons and traveled across the country with the single-minded purpose to obstruct the certification of the Electoral College results, because they refused to accept the outcome of the democratic process. And on January 6, 2021, wearing tactical gear and carrying weapons, they knowingly, voluntarily, and enthusiastically joined forces with others in forming a mob that accomplished their goal—for a time. Despite their efforts, and contrary to their aims, after hours of chaos and destruction at the U.S. Capitol, the Electoral College results were ultimately certified. But the crimes the Defendants conspired to and did commit struck a blow to the very foundation of the American system. Their obstruction of the most essential functioning of the United States government was unprecedented. And the impact of their conduct has reverberated long beyond the several hours when Congress was in recess.

For these crimes, and for the reasons set forth herein, the United States requests that the

1

Court depart or vary upwards from the advisory Guidelines to sentence the Defendants to the following terms:

- Erik Warner: 96 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and a fine of $15,827.

- Felipe Antonio Martinez: 78 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and a fine of $30,315.

- Derek Kinnison: 96 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and a fine of $48,411.

- Ronald Mele: 96 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and a fine of $39,402.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

The Defendants participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]   As the Court

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim.   MPD recently submitted a total of approximately $629,056 in restitution amounts, but the United States has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the United States has sought restitution based on a case-by-case evaluation.

recently found, "On January 6, 2021, a mob of people invaded and occupied the United States Capitol, using force to interrupt the peaceful transfer of power mandated by the Constitution and our republican heritage."   Notes for Resentencing, *United States v. Little*, 21-cr-315-RCL, ECF No. 73.   "This was not a protest that got out of hand.   It was a *riot*; in many respects a *coordinated* riot."   *Id.* (citing *United States v. Hostetter*, 21-cr-392).   The United States refers the Court to the Statement of Offense filed as to Russell Taylor, the Defendants' codefendant, for a short summary of the January 6, 2021 attack on the United States Capitol.   ECF No. 197 at ¶¶ 1–7.

**B.     The Roles of Alan Hostetter and Russell Taylor in the January 6, 2021 Attack on the Capitol**

The United States refers the Court to the Government's Sentencing Memorandum as to Alan Hostetter, another codefendant, for a summary of Hostetter and Russell Taylor's conduct in advance of and during the January 6, 2021 attack.   ECF No. 383.

**C.     The Defendants' Roles in the January 6, 2021 Attack on the Capitol**

*"Imagine if 3% of People . . . Stormed the Capitol":*
*The Defendants' Plans for January 6, 2021*

The Defendants began planning for January 6 in late December 2020.   On December 19, 2020, then-President Trump shared a Tweet, writing, "Statistically impossible to have lost the 2020 Election.   Big protest in D.C. on January 6th.   Be there, will be wild!"   Exhibit 407.   The Defendants took notice, and within days, they began organizing.   Exhibits 542, 621, 626, 632.01. On December 22, 2020, Kinnison messaged his fellow Three Percenters over Telegram, including Warner, Martinez, and Mele, "imagine if 3% of people who signed the newscum petition stormed the Capitol."   Exhibit 548.01.   Two days later, Mele sent his coconspirators an article from the

3

Washington Post, titled "Trump supporters plan D.C. rally on day Congress certifies election results."   Exhibits 548.04, 548.04A.   Other messages similarly confirm that the Defendants were closely monitoring the efforts to overturn the election results and the upcoming Electoral College certification proceeding.   *See, e.g.*, Exhibits 548.03, 549.02, 549.02A, 1033.06, 1033.08, 1033.16.

As the Defendants readied themselves for Washington, D.C., they spoke in terms of war, soldiers, and battles.   On December 25, 2020, Kinnison messaged the group, invoking the American revolution of 1776 and writing, "[W]e have reached our 'throw off such government' moment."   Exhibit 548.05.   He added, "Hope to you see on Jan 6th."   *Id.*   On December 29, 2020, Mele wrote on Facebook that the group was "[s]oldiers hitting the highway soon to be in DC on the 6th.   Ready up!"   Exhibit 1033.05.   In the Answer the Call Telegram group, discussed further below, on December 31, 2020, Warner wrote, "See you on the front line" with a skull emoji.   Exhibit 547.04.   On January 3, 2021, Martinez wrote, "Our President is mustering his troops."   Exhibit 627; *see also* Exhibit 633.01.   That same day, when asked why he was going to Washington, D.C., Martinez said he was going to "[r]aise some hell son."   Exhibit 633.01.

In addition to conspiring among themselves, the Defendants also conspired with a larger group over Telegram: The California Patriots– DC Brigade (the "DC Brigade").   *See* Exhibits 766, 866, 903.   The DC Brigade, founded and organized by Russell Taylor and Alan Hostetter, was intended to be a "group of fighters" from California who would travel to Washington, D.C. for January 6, 2021, collect weapons, and be prepared for violence on that day.   Exhibit 903.   In introducing the group, organizer Russel Taylor wrote, "This thread is exclusive to be utilized to organize a group of fighters to have each other's backs and ensure that no one will trample on our

rights."   *Id.*   He added, "I am assuming that you have some type of weaponry that you are bringing with you and plates as well."   *Id.*   The image for the group was of a revolutionary-style soldier standing in front of the U.S. Capitol building, carrying weapons.   *Id.*

From: 1244941279 Porter RockQwell (owner)

Also, please keep chatter here to a bare minimum and use the other thread to share memes, news and information.

This thread is exclusive to be utilized to organize a group of fighters to have each other's backs and ensure that no one will trample on our rights. Also, if there is key intel that we need to be aware of tor possible threats.

I am assuming that you have some type of weaponry that you are bringing with you and plates as well.

1/1/2021 9:14:14 AM(UTC-8)

*Exhibit 903*



*Exhibit 903*

Members of the group discussed their expectation for violence on January 6.   One member wrote, "I am going to dc for rally not to talk but to take care of business, time for talking is over! This is tyranny and our constitution states we can put bitches 6ft deep!   Let's do it!   There are not enough cops to stop us!"   Exhibit 903.   Another member added, "Diplomatic on occasion,

less likely this time.    Armed."    *Id.*    Kinnison introduced himself, Warner, Martinez, and Mele to the group as "so cal 3%," invoked their "train[ing]" with the Three Percenter militia, and advised the group that they would be bringing "lots of gear" to D.C., including "bear spray, knives, flags, plates[,] goggles, helmets."    *Id.*    In a sign that he knew what they were planning was unlawful, Kinnison wrote, "we should clear all text in this chat the morning of the 5th just in case for opsec purposes."    *Id.*

> **From: 1029438066 Derek Midnightrider**
> I'm Derek, driving up with Tony Redline and Erik. We are part of so cal 3%, we work well and train with each other. Leaving tomorrow and driving instead of flying because our luggage would be too heavy  We will have lots of gear from medical kits, radios, multiple cans of bear spray, knives, flags, plates goggles, helmets. I'm not military or Leo but I can order a mean pizza reach things on the top shelf and know how to give Indian burns.  I think we should clear all text in this chat the morning of the 5th just in case for opsec purposes.

*Exhibit 903*

The DC Brigade was not the only Telegram group Taylor and the Defendants used to organize for January 6.    They also used a larger Telegram group called "The California Patriots–Answer the Call" ("Answer the Call"), which was named in response to the group's efforts to organize after then-President Trump's December 19, 2020 Tweet.    The two groups were closely related; in fact, the DC Brigade Telegram group was organized among those "comfortable with violence" from the Answer the Call group.    Exhibit 547.06.    Moreover, the content in the Answer the Call Telegram group was similar to that of the DC Brigade.    In that group, Taylor repeated the group's plan to "March up to the capital and be there to surround the capital."    Exhibit 547.10; *see also* Exhibit 547.15 ("Spread the word to other CALIFORNIA Patriots to join us as we March into the Capitol Jan 6.").    Far from being a mere observer, Kinnison volunteered to organize "comms" for both the Answer the Call and DC Brigade Telegram groups.    *See, e.g.*, Exhibits 905,

903, 547.03, 547.05.

The Defendants made good on their pledge to the DC Brigade that they would be collecting and transporting weapons; they brought all those items and more to Washington, D.C. *See* Exhibit 1159. In their communications, the Defendants were clear that they were driving—rather than flying—to facilitate their transportation of weapons across the country. *See* Exhibits 547.01, 1033.07 (Mele: "[G]oing to rent a suburban. . . . Need room for the 'gear.'"). They collected and brought helmets and other tactical gear. Exhibits 623.03A, 623.03B, 1033.04. They brought knives. Exhibits 754 (Martinez carrying a pocket knife), 882 (Mele: "am armed with knives and bear spray lol."). They brought bear spray and pepper spray. Exhibit 548.04F. On January 2, 2021, Mele posted the message "Departure [] day" on Facebook, along with an image of a plate carrier, a knife, a magazine of ammunition, bear spray, and other items. Exhibit 1033.04.



*Exhibit 1033.04*

7

The Defendants departed for Washington, D.C. on January 2, 2021, in an SUV Mele rented. Exhibits 1040, 1033.04.   They checked into their hotel—also reserved under Mele's name—on January 4.   Among their other weapons, with the full knowledge of their trial codefendants, Kinnison and Mele also brought multiple firearms and ammunition to Washington, D.C.   Exhibits 603–606, 627; *see also* Exhibit 627 (Martinez joking that "We're packing light just a scatter gun and a pistol a piece.").   Kinnison and Mele brought five handguns to Washington, D.C., which they claim they stored, along with ammunition, in the hotel room they stayed in.   The Defendants also brought a shotgun, *see* Exhibits 603–605, 632.10, which they claimed they kept in the vehicle the group traveled in.   The Defendants brought these firearms despite understanding that it was illegal.   *See* Exhibits 632.09 (Mele: "I have a lockbox that I can bring for it.   Just need to make sure she understands CA CCW doesnt have reciprocity in DC in fact all personal protection devices are not allowed."), 548.04 (Mele: "No firearms allowed at any rally in DC.   Open carry is prohibited."), 548.04D (a reciprocity map, shared by Mele), 548.04E (a list of jurisdictions where "[p]ermit(s)" are "[n]ot [h]onored," including District of Columbia, shared by Mele).

As the Defendants planned for their trip, Kinnison shared a selfie of himself wearing a bandolier of shotgun shells.   Exhibits 632.11, 632.11A.



*Exhibit 632.11A*

Then, once at the hotel, Mele took photographs of the handguns, holsters, ammunition, and magazines they brought into their hotel room.   Exhibits 898–899.



*Exhibit 898*



*Exhibit 899*

### *"In These Streets, We Will Fight and We Will Bleed": January 5, 2021*

On January 5, 2021, the Defendants attended a rally outside the U.S. Supreme Court, at which Russell Taylor and Alan Hostetter, among others, both spoke.   *See* Exhibits 301, 750, 852, 547.09.   Taylor and Hostetter repeated the violent rhetoric that had been the calling card of the DC Brigade Telegram group.   Taylor told the crowd, "in these streets, we will fight and we will bleed," and "we will not return to our peaceful way of life until this election is made right." Exhibit 301.   Hostetter said, "Our voices tomorrow are going to put the fear of God in members of Congress," and "They need to know that we as a people are coming for them if they do the wrong thing."   *Id.*   As these remarks were made, the Defendants stood toward the front of the crowd, listening to their coconspirators speak.   *Id.*

On the evening of January 5, the Defendants went out to Black Lives Matter Plaza looking for trouble.   There, in a preview of what was to come the next day, they confronted police lines, defied police commands, and shouted at officers.   *See* Exhibits 209, 306.   Martinez and Kinnison were pepper sprayed after refusing police commands to back away from the police line.   Exhibit 307; *see also* Exhibits 548.09, 828–829.

11



*Exhibit 209*



*Exhibit 306*



*Exhibit 307*

### *"This Is the Storm of the Capitol Right Here":*
### *The January 6, 2021 Attack on the U.S. Capitol Building*

On January 6, 2021, the Defendants gathered together near the Washington Monument to listen to then-President Trump's speech at the Ellipse.   *See, e.g.*, Exhibits 411, 521, 831–832, 853. The Defendants had intended to meet up with Russell Taylor and other members of the DC Brigade in the early morning, Exhibit 634, but were too late to join them; they were, as they explained to the DC Brigade, "moving slow . . . after police pepper sprayed two of us."   Exhibit 903.

From the Ellipse area, the Defendants walked to the U.S. Capitol.   As they approached, the Defendants were wearing tactical gear and carrying weapons.   Specifically, Martinez and Mele wore ballistic plate carriers.   *E.g.*, Exhibits 841, 858.   Warner wore a helmet and carried a thick wooden flag pole like a baton.   *E.g.*, Exhibit 323.   Kinnison wore a gas mask.   *E.g.*, Exhibit

13

754.    Warner, Martinez, and Mele each carried cans of bear spray.[2]   *E.g.*, Exhibits 323, 841, 858.

Martinez carried a pocketknife.   Exhibit 754.   Mele was carrying knives.   Exhibit 882.





*Exhibit 323*                   *Exhibit 841*                   *Exhibit 858*

As the Defendants approached the building, at about 2:00 p.m., Kinnison called out the "flash bang grenades" he heard police deploy, and announced, "this is the storm of the Capitol right here."   Exhibits 753, 855.   Warner directed his coconspirators to move "through the opening" in the large metal barricades meant to protect the Capitol building, directing them into the restricted area.   Exhibits 753, 855.   As they continued closer to the building, Mele called out, "flash bangs, flash bangs, riot gas coming," alerting his coconspirators to continued police efforts to disperse the crowd.   Exhibit 856.

Despite these signs that the Defendants were not allowed to be there, the Defendants continued onto the northwest lawn below the Upper West Terrace.   There, Warner separated from the other Defendants.   At approximately 2:10 p.m.—less than a minute after the breach of the police line that had been protecting the northwest stairs leading to the Upper West Terrace—

---

[2]  Three cans of bear spray were later recovered from Kinnison's home.   Exhibit 1156.19.

Warner was walking up the northwest stairs, to the Upper West Terrace.  Exhibit 101.  As he ascended, he turned back to the crowd, yelled in their direction, and gestured for them to move forward.  Exhibits 101, 321, 324.  As he turned and ascended the stairs further, he called out for rioters to "hold the line!"  Exhibit 323.  Like his codefendants, Warner wore a radio earpiece in his ear.  As he continued up to the Upper West Terrace, he walked past metal barricades and Area Closed signs at the top of the stairs and proceeded to the Senate Wing Door.  *See* Exhibits 102, 323.



*Exhibit 323*



*Exhibit 323*

At approximately 2:13 p.m.—within a minute of the first breach of the building—Warner entered the U.S. Capitol building through a broken window near the Senate Wing Door, following other rioters.  Exhibit 103.  As he entered the building, as seen above and below, Warner was wearing a helmet and carrying a thick wooden flagpole in his hand, along with a visible can of bear spray attached to his backpack.  *Id.*; *see also* Exhibits 327–328.

16



*Exhibit 103*

Warner exited the Capitol building through the Senate Carriage Door at approximately 2:16 p.m., after encountering police.   Exhibits 104–106.   From there, he walked around the East Front of the Capitol, where he tried to enter the building again through an entrance on the southeast side.   Exhibits 108, 330.   When he was unable to enter there, Warner walked back to the west side of the building, Exhibit 111, climbed up scaffolding overlooking the Inaugural Stage, and then climbed onto the Inaugural Stage, Exhibits 345.01, 346.   Warner remained on the Inaugural Stage from approximately 2:41 p.m. to approximately 3:18 p.m. while some of the most intense fighting at the Lower West Terrace Door was taking place.   Exhibits 115–116; *see also* Exhibits 340, 343.01, 359.   Between approximately 4:18 p.m. and 4:50 p.m., Warner moved through Capitol grounds between the Upper West Terrace and the northwest stairs.   Exhibits 121–123, 348.01, 349, 527.

While Warner was ascending the northwest stairs and breaking into the building, Martinez, Kinnison, and Mele remained on the northwest lawn.   There, they saw additional levels of police protection fall.   When police barricades were thrown to the ground, Martinez, Kinnison, and Mele marched forward right over them.   Exhibit 321; *see also* Exhibit 754.



*Exhibit 321*

On the northwest lawn, Martinez, Kinnison, and Mele saw police officers—mere feet away from them—under assault from the rioters, with rioters throwing chairs and other objects at police. Exhibits 318–319, 321, 754.   They observed one officer directly in front of them attacked with bear spray and knocked to the ground.   Exhibits 318–319, 321, 754.



*Exhibit 319*



*Exhibit 321*

After seeing this vicious assault, these Defendants—who, at times during this trial, incredibly claimed that they were at the Capitol to protect others—did not walk away.   And they did not turn their backs to the police to help protect them from the mob.   Rather, Martinez, Kinnison, and Mele, made plain their common cause with the mob, as they, along with other rioters, advanced against the police as fellow rioters called out, "We've got 'em surrounded!" Exhibit 754.   As the police were surrounded, under assault, and forced to retreat, Mele shouted out in their direction, "Push!  Push!  Push!  Fuck you!  Push!"  Exhibit 858.   Martinez, Kinnison, and Mele then continued advancing on the police.   *Id*.   As the police retreated, the three defendants celebrated, with Mele repeatedly calling out, "Yeah!"   *Id.*

After police had retreated from the area, Martinez, Kinnison, and Mele gathered on the area of the northwest lawn just below the Upper West Terrace, where they continued celebrating. Exhibit 755.   It was there that they first learned that Warner and others had broken into the building.   Exhibit 756.   When they heard the news, Martinez shouted, "We need to get up there!" and directed the group to the northwest stairs—the same stairs that Warner had previously climbed. Exhibit 859; *see also* Exhibit 757.   As they walked toward the stairs, Martinez yelled for the crowd to join him, calling out, "Come on!" and waving his arm toward the Upper West Terrace.   Exhibit 859.

As the three men climbed the northwest stairs beginning at approximately 2:25 p.m., Mele climbed through scaffolding, and Martinez and Kinnison helped other rioters scaling the walls. Exhibit 109.



*Exhibit 109*

Mele called for the crowd to push forward and announced on video that they were storming the Capitol.   Exhibit 881.   Once on the Upper West Terrace, Mele took a video of another rioter climbing the walls above the Senate Wing Door.   As he watched that rioter climbing on the building, Mele called out "Wow!" and cheered enthusiastically.   Exhibit 863.

Mele separated from Kinnison and Martinez and left the Upper West Terrace at approximately 2:45 p.m., going down the northwest stairs he had previously climbed up.   Exhibit 117.   As he walked down, Mele continued celebrating and attempted to incite the crowd below by holding up in triumph a can of Twisted Tea he had been carrying.   Exhibit 326.01.



*Exhibit 326.01*

Mele remained on Capitol grounds until at least approximately 4:18 p.m.   Exhibit 333.01.

While on Capitol grounds, Mele took a selfie photograph of himself, with his can of bear spray

visible within his ballistic plate carrier.   Exhibit 841.



*Exhibit 841*

22

At approximately 2:45 p.m., Martinez and Kinnison, now separated from Mele, moved toward the Upper West Terrace Door, but retreated north once police converged on the door to block rioters from entering the Capitol building.   Exhibits 350, 758.   Kinnison called out, "Oh shit!" as he saw the police approaching and was forced to retreat.   Exhibit 758.   While on the Upper West Terrace, Martinez and Kinnison met with their codefendants and DC Brigade organizers Russell Taylor and Alan Hostetter.   Exhibits 119, 409.   The below photograph, Exhibit 409, which was taken on the Upper West Terrace by Hostetter at approximately 4:11 p.m., features Martinez, Kinnison, and Taylor, with Taylor on the right wearing a ballistic plate carrier over his chest, a visible knife handle sticking up from the ballistic vest, and hard-knuckle reinforced gloves.   Exhibit 409.



*Exhibit 409*
23

Martinez and Kinnison remained on the Upper West Terrace until approximately 4:35 p.m., when they were removed when additional police arrived and cleared the Upper West Terrace of rioters.   *See* Exhibits 213, 762, 124, 354.01.   Warner ultimately reunited with Martinez, Kinnison, and other Three Percenters on the north side of the building after 4:50 p.m.   Exhibits 125, 357.

While still on Capitol grounds, and shortly after he left, Mele was bragging to others about his role in the riot.   To one person he wrote, "It's fucking hairy!   Rushed the Capitol.   Climbed the scaffolding and banged on the glass windows!   Got gassed and flash banged."   Exhibit 808. To another he boasted, "Got hairy entering the Capitol grounds and ascending to the 2nd level deck in an unconventional way.   Actually climbed some scaffolding under white tarps to get up to second deck.   Flash bangs and tear gas deployed but we were ready this time."   Exhibit 810; *see also* Exhibits 807, 815, 816.   When his wife texted him to alert him that "protesters actually entered the capital and they are evacuating VP Pence," Mele wanted to make sure he got credit, so he told his wife, "Babe that was us."   Exhibits 814, 882.   On the evening of January 6, Mele posted to his Facebook followers a photograph of himself back at the hotel, wearing his tactical gear, and wrote, "Epic day in history."   Exhibit 1033.03.

### Kinnison and Warner's Cover Up

Knowing they had committed crimes at the Capitol, Kinnison and Warner attempted to cover up their actions on and planning for January 6 by deleting the DC Brigade Telegram chat, among other evidence, from their phones.

A manual review of Kinnison's cell phone reveals his efforts to delete content around the

24

time of January 6, 2021.   Specifically, a search of his phone showed no emails between December 30, 2020 and January 12, 2021, Exhibits 702–703, and no text, Telegram, or Signal messages before January 11, 2021 with any of his trial codefendants, Exhibits 706–716.   And despite Kinnison's phone settings being set to retain text messages forever, Exhibit 723, there were no text messages on his phone between September 12, 2020, and January 16, 2021, Exhibit 724.

Kinnison also sent messages demonstrating his intent to obstruct the investigation into the attack at the Capitol.   For example, on January 10, 2021, Kinnison wrote that he "cleared this and other chats multiple times to protect everyone else."   Exhibit 548.14; *see also* Exhibits 548.11 ("[W]e should watch what we type here."), 609 ("I wouldn't text too much about last week."), 622 (same).

> From: 1029438066 Derek Kinnison
>
> So when I was out of town I cleared this and other chats multiple times to protect everyone else, upon digging deep into telegram settings I found even after clearing the chats my phone had 10g telegram storage and still showed groups that I deleted months ago so I had to manually clear that as well. So yes there is encryption against hacking but if someone gets your phone all they have to do is open the app. They creator of the chat cannot clear the chat for everyone else so it's up to you to do it.
> Food for thought...
>
> 1/10/2021 2:57:51 PM(UTC-8)

*Exhibit 548.14*

Despite his efforts to conceal his involvement, text messages to and from Kinnison were recovered from other devices.   And the DC Brigade Telegram group was recovered from Kinnison's phone in a forensic review, where it was marked as "Deleted," Exhibit 766, and a manual review of Kinnison's phone showed that the Telegram group had, in fact, been deleted, Exhibits 779.03–779.06.

Warner similarly attempted a clean sweep of the contents of his phone from the time period

surrounding January 6, 2021.   After the riot, Warner knew that he would be in trouble with the law.   Shortly after the riot, footage was released that showed Warner inside the U.S. Capitol building—and it was making national news.   Exhibit 630.01.



*Exhibit 630.01*

On January 8, 2021, a friend messaged Warner, "I saw ur photo on americas most wanted." Exhibit 543.   Warner responded, "No Alphabet boys at my house yet," referring to the FBI.   *Id.*; *see also* Exhibits 544 ("I didn't lose my job yet.   Not sure about the FBI."), 555 ("My picture was on all the news channels about DC. . . . I'm pretty sure whoever turned me in to [work] will also turn me in to the feds.").

Knowing he faced prosecution, Warner tried to delete evidence of his crimes.   An initial manual review of Warner's cell phone showed no Telegram messages before January 27, 2021, Exhibit 502, and no phone calls prior to February 17, 2021, Exhibit 514.01.   And although his phone was set to retain messages forever, Exhibit 503, Warner's phone had no messages at all prior to February 5, 2021, Exhibit 504.   However, a forensic extraction did recover some deleted messages, demonstrating the Warner intentionally deleted potential evidence.   Exhibits 550, 552.

And while no text messages with Defendants could be recovered from Warner's phone, Exhibit 506, these messages were recovered from other devices.

But even while he was deleting evidence of his conduct, Warner wanted to save his January 6 photographs as trophies.   Warner sent photographs from January 6 to a friend to store on a hard drive, so that he could delete them from his phone and conceal them from law enforcement. Exhibit 554.



*Exhibit 554*

Despite his participation in the group, the DC Brigade Telegram group was also deleted from Warner's phone, and, accordingly, it did not appear in either a manual or forensic review of the phone.

***"I Was in DC . . . Where the Fuck Were You?":***
***The Defendants Celebrate Storming the Capitol***

In the days that followed, after participating in the riot at the Capitol, the Defendants each celebrated their accomplishments. On January 22, 2021, Mele "awarded" the Capitol Action Badge to his coconspirators, as a "badge of honor."[3] Exhibits 630, 878. In that message, he sarcastically characterized the rally as "[p]eaceful." Exhibits 630, 878.

From: ███████   Red Line Ron
To: ███████   3per Derek Kinnison
To: ███████   This Guy!
Derek Kinnison and Tony Martinez, on this day 22 January 2021, I award you with this badge of honor for being part of a "Peaceful" rally and showing our pride in our country.

*Exhibit 878*



*Exhibit 878.02*

---

[3] The "Capitol Action Badge" is a crudely modified version of a real military award—the Combat Action Badge—that is awarded "when [a soldier is] directly engaging with the enemy either through fire or, you know, mortar rounds hitting within a certain vicinity." Oct. 25 Trial Tr. 168:8–10. Incredibly, Mele, who served in the Air Force, claimed at trial that he never knew what the Combat Action Badge was, or what the Capitol Action Badge was modeled on. Nov. 3 Trial Tr. 71:2–9.

In the same exchange, Martinez talked about making t-shirts to commemorate their role in the riot. Exhibit 878.   Martinez proposed the following language, "I was in DC…where the fuck were you?"   *Id.*

For his part, Warner was privately laughing about breaking into the Capitol and making members of Congress fear for their lives.   On February 6, 2021, he shared a meme that superimposed his face onto an image from the movie The Shining, which showed him breaking through a door with an axe, and Representative Alexandria Ocasio-Cortez in fear.   Exhibit 522; *see also* Exhibit 519 (Warner sending this image to another person, with a crying laughing emoji).



*Exhibit 522*

In the days following the riot, Kinnison shared messages comparing the riot to the Boston Tea Party.   Exhibit 869.04; *see also* Exhibit 547.14.   He expressed his hope that Nancy Pelosi was "hanging high."   Exhibit 725.   And when he learned that National Guard troops had been

deployed to Washington, D.C. to safeguard the Inauguration, he ominously talked about "2 million patriots" returning to Washington, D.C. "with something on their shoulder"—warning that the next insurrection would be more heavily armed.   Exhibit 548.15.

## II.      THE CHARGES AND VERDICT

On May 10, 2023, a federal grand jury returned a Second Superseding Indictment charging the Defendants with four counts: Count One (Conspiracy To Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k)); Count Two (Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) & 2); Count Five (Entering and Remaining in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(1)); and Count Six (Disorderly and Disruptive Conduct in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(2)).   Kinnison and Warner were each also charged with a fifth count—Counts Seven and Eight, respectively—for Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1).[4]   On November 7, 2023, the Defendants were convicted on all counts following a jury trial.   Minute Entry of November 8, 2023; ECF No. 376.

## III.     STATUTORY PENALTIES

The Defendants now face sentencing on each of these offenses.   As noted by the Presentence Reports ("PSRs") issued by the U.S. Probation Office, *see, e.g.*, Warner PSR at ¶¶ 154–56, 160–61 & 176–177, the Defendants face a maximum sentence of 20 years'

---

[4] At the request of the Court, on November 8, 2023, the United States filed a Retyped Indictment, which did not substantively change the counts against the Defendants, but excluded counts relevant only to codefendants Alan Hostetter and Russell Taylor, so as the facilitate consecutive numbering of counts, to avoid jury confusion.   Minute Entry of November 8, 2023.   Throughout this filing, the United States refers to counts by their numbering in the Second Superseding Indictment.

imprisonment, 3 years' supervised release, and a fine of $250,000 for each of Counts One and Two; and a maximum sentence of 1 year's imprisonment, 1 year's supervised release, and a fine of $100,000 for each of Counts Five and Six.   Kinnison and Warner also face a maximum sentence of 20 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for Counts Seven and Eight, respectively.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Guidelines Calculations

The United States submits that the calculation laid out in the Defendants' PSRs for Count Two, the § 1512(c)(2) offense, is correct.   Warner PSR at ¶ 94–104; Martinez PSR at ¶ 93–103; Kinnison PSR at ¶ 95–105; Mele PSR at ¶ 92–101.   The PSRs reflect the D.C. Circuit's opinion in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024).   *Brock* held that the term "administration of justice," as used in Guidelines § 2J1.2, does not apply to Congress' certification of Electoral College votes.   *See id*. at 51.   Accordingly, the enhancement in Guidelines § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of Electoral College votes.   U.S.S.G. § 2J1.2(b)(2); *Brock*, 94 F.4th at 51.   This holding also precludes application of the eight-level enhancement in Guidelines § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property

damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of Electoral College votes.  *Id.*

Probation did not calculate the offense level for the other counts of conviction, which this Court must do.  *See* U.S.S.G. § 1B1.1(a)(4).

### a. Warner

For Warner, the United States' calculations of the offense levels for each of the counts of conviction are as follows:

**Count One: 18 U.S.C. § 1512(k):**

| | | |
|---|---|---|
| U.S.S.G. § 2X1.1(a) | Conspiracy Base Offense Level (Adjusted) | 16 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 18 |

**Count Two: 18 U.S.C. § 1512(c)(2), § 2**

| | | |
|---|---|---|
| U.S.S.G. §§ 2J1.2(a), 2X2.1 | Obstruction Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 18 |

**Count Five: 18 U.S.C. § 1752(a)(1)**

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Trespass Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon Possessed | +2 |
| U.S.S.G. § 2B2.3(c)(1) | Intent To Commit A Felony | 16 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 18 |

**Count Six: 18 U.S.C. § 1752(a)(2)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Trespass Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 12 |

**Count Eight: 18 U.S.C. § 1512(c)(1)**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Obstruction Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3)(B) | Essential or Especially Probative Record | +2 |
| | Total | 16 |

### b. Martinez

For Martinez, the United States' calculations of the offense levels for each of the counts of

conviction are as follows:

**Count One: 18 U.S.C. § 1512(k):**

| | | |
|---|---|---|
| U.S.S.G. § 2X1.1(a) | Conspiracy Base Offense Level (Adjusted) | **16** |
| | Total | **16** |

**Count Two: 18 U.S.C. § 1512(c)(2), § 2**

| | | |
|---|---|---|
| U.S.S.G. §§ 2J1.2(a), 2X2.1 | Obstruction Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(3) | Extensive Scope, Planning, or Preparation | **+2** |
| | Total | **16** |

**Count Five: 18 U.S.C. § 1752(a)(1)**

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Trespass Base Offense Level | **4** |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | **+2** |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon Possessed | **+2** |
| U.S.S.G. § 2B2.3(c)(1) | Intent To Commit A Felony | **16** |
| | Total | **16** |

**Count Six: 18 U.S.C. § 1752(a)(2)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Trespass Base Offense Level | **10** |
| | Total | **12** |

### c. Kinnison

For Kinnison, the United States' calculations of the offense levels for each of the counts of

conviction are as follows:

**Count One: 18 U.S.C. § 1512(k):**

| | | |
|---|---|---|
| U.S.S.G. § 2X1.1(a) | Conspiracy Base Offense Level (Adjusted) | **16** |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | **+2** |
| | Total | **18** |

**Count Two: 18 U.S.C. § 1512(c)(2), § 2**

| | | |
|---|---|---|
| U.S.S.G. §§ 2J1.2(a), 2X2.1 | Obstruction Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(3) | Extensive Scope, Planning, or Preparation | **+2** |

| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 18 |

**Count Five: 18 U.S.C. § 1752(a)(1)**

| U.S.S.G. § 2B2.3(a) | Trespass Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon Possessed | +2 |
| U.S.S.G. § 2B2.3(c)(1) | Intent To Commit A Felony | 16 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 18 |

**Count Six: 18 U.S.C. § 1752(a)(2)**

| U.S.S.G. § 2A2.4(a) | Trespass Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 12 |

**Count Seven: 18 U.S.C. § 1512(c)(1)**

| U.S.S.G. § 2J1.2(a) | Obstruction Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3)(B) | Essential or Especially Probative Record | +2 |
| | Total | 16 |

### d. Mele

For Mele, the United States' calculations of the offense levels for each of the counts of conviction are as follows:

**Count One: 18 U.S.C. § 1512(k):**

| U.S.S.G. § 2X1.1(a) | Conspiracy Base Offense Level (Adjusted) | 16 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 18 |

**Count Two: 18 U.S.C. § 1512(c)(2), § 2**

| U.S.S.G. §§ 2J1.2(a), 2X2.1 | Obstruction Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Total | 18 |

**Count Five: 18 U.S.C. § 1752(a)(1)**

| U.S.S.G. § 2B2.3(a) | Trespass Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon Possessed | +2 |

34

| U.S.S.G. § 2B2.3(c)(1) | Intent To Commit A Felony | **16** |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | **+2** |
| | Total | **18** |

**Count Six: 18 U.S.C. § 1752(a)(2)**

| U.S.S.G. § 2A2.4(a) | Trespass Base Offense Level | **10** |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | **+2** |
| | Total | **12** |

**B.  Grouping Analysis**

Under Guidelines § 3D1.2, "closely related counts" group.   Counts One, Two, Five, and Six should be placed into a single group for Guidelines calculation purposes because the offense involved the same victim (Congress) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.   *See* U.S.S.G. § 3D1.2(a).

Additionally, under Guidelines § 3D1.2(c), "When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guidelines applicable to another of the counts," the counts should group together.   *Id.*   Application Note 5 of Guidelines § 3D1.2 indicates that obstructive conduct separately taken into account as an enhancement under Guidelines § 3C1.1 should be treated in the same group to which that enhancement applies.   Accordingly, here, because obstructive conduct under § 1512(c)(1) "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guidelines applicable," U.S.S.G. § 3D1.2(c), to the Count Two offense, Counts Seven and Eight should group with Counts One through Four.

Accordingly, for all defendants, there is only a single group, and the combined offense level is, therefore, 18 for Warner, Kinnison, and Mele.   The combined offense level is 16 for Martinez.   *See* U.S.S.G. § 3D1.3(a).

35

### C.  Relevant Conduct

As the Guidelines make clear, specific offense characteristic enhancements shall be applied on the basis of "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "all harm that resulted from th[os]e acts and omissions . . . and all harm that was the object of such acts and omissions."  U.S.S.G. § 1B1.3(a)(1)(A) & (a)(3).  Likewise, these enhancements shall also apply, in a conspiracy case, such as this one, on the basis of "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity," and "all harm that resulted from th[os]e acts and omissions . . . and all harm that was the object of such acts and omissions." U.S.S.G. § 1B1.3(a)(1)(B) & (a)(3).  As the Defendants conspired to obstruct the certification of the official proceeding with each other, as well as with other members of the DC Brigade Telegram group, the Court should consider not only their conduct but also the conduct that they aided and abetted and the conduct of their coconspirators that was within the scope of their conspiracy, in furtherance of their conspiracy, and reasonably foreseeable.

### D.  Applicable Sentencing Enhancements

#### a.  The Section 2J1.2(b)(3) Enhancement for Extensive Scope, Planning, or Preparation Applies

The United States agrees with Probation that the two-level enhancement under Guidelines § 2J1.2(b)(3) for an offense that was "extensive in scope, planning, or preparation" is applicable. Here, the Defendants were found guilty of forming and entering a conspiracy to obstruct the certification of the Electoral College vote.   That conspiracy involved extensive planning, such as

collecting weapons and traveling cross-country by car to transport those weapons for potential use at the Capitol on January 6, 2021.   They arrived in Washington, D.C. with firearms, cans of bear spray, knives, and tactical gear.   They coordinated with other groups, including the DC Brigade Telegram group, for which Kinnison took the lead in organizing on-site communications.   These Defendants were not ordinary rioters.   Their planning and preparation for the riot was extensive and sets them apart from many other January 6 defendants.   Accordingly, the Court should apply the enhancement.

### b.   The Section 3C1.1 Enhancement for Obstruction of Justice Applies

Guidelines § 3C1.1 provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."   U.S.S.G. § 3C1.1.   This enhancement should be applied to Warner, Kinnison, and Mele.

#### i.   Warner

The jury found Warner guilty of Count Eight (18 U.S.C. § 1512(c)(1)), which charged him with obstructing the grand jury's investigation into the January 6 attack by deleting the DC Brigade Telegram group from his phone.   On the basis of Warner's destruction of evidence, the Court should apply this enhancement.

#### ii.   Kinnison

The jury also found Kinnison guilty of Count Seven (18 U.S.C. § 1512(c)(1)), which

charged him with obstructing the grand jury's investigation into the January 6 attack by deleting the DC Brigade Telegram group from his phone.  On the basis of Kinnison's destruction of evidence alone, the Court should apply this enhancement.

Moreover, while Kinnison's Count Seven conviction provides sufficient grounds for the enhancement, the Court should also apply the enhancement on the basis of Kinnison's obstructive conduct in his false testimony to the jury at trial.  *See* U.S.S.G. § 3C1.1 n.4(B), (F).  Among others, Kinnison made the following materially false statements during his testimony:

- Kinnison testified that he ceased communications with the Oath Keepers in 2019.  *See* Oct. 30 Trial Tr. 73:23–74:9.  But trial evidence revealed that Kinnison was in contact with Oath Keepers repeatedly between January 5 and January 7.  Exhibit 906; Oct. 26 Trial Tr. 177:3–19.  This testimony was material to Kinnison's advance planning, knowledge of the nature of the official proceeding, and intent to obstruct.

- Kinnison testified that he does not view the Three Percenters as a militia.  *See* Oct. 30 Trial Tr. 74:15–75:3.  Trial evidence revealed that Kinnison himself referred to the group as a militia.  Exhibit 704 ("I filled out my info for this M_i_liti_a group.").  This testimony was material to Kinnison's preparations for violence and intent to obstruct.

- Kinnison testified that the Defendants' intention on January 5 and 6 was to provide security and not to interfere with the congressional proceeding.  *See* Oct. 30 Trial Tr. 104:17–105:3; 105:16–22; 143:24–25.  In addition to the jury finding otherwise, Kinnison's own codefendant, Ronald Mele, admitted that was not the case.  *See* Nov. 2 Trial Tr. 66:13–17 ("Q. Was there, for example, discussion about providing security at rallies in Washington, DC?  A. No discussions to provide security."); 105:7–20; 110:11–16 ("Q. Had you ever heard that you were going to be providing security at the Trump speech?  A. No, sir."). This testimony was material to Kinnison's advance planning and intent to obstruct.

- Kinnison testified that he went to the Capitol because Antifa had broken into the Capitol.  *See* Oct. 31 Trial Tr. 37:11–39:1.  But when he arrived at the Capitol, Kinnison proclaimed it was the "storm of the Capitol" as he and his coconspirators moved toward the building, demonstrating that he understood it was Trump supporters, and not Antifa.  Exhibit 753. This testimony was material to Kinnison's intent to obstruct.

- Kinnison testified that there were no bike racks in their path as they approached the Capitol.  *See* Oct. 31 Trial Tr. 40:9–17.  This is contradicted by video evidence showing that

Kinnison saw bike racks in his path as he approached the Capitol.  Exhibit 321.  Indeed, he walked right over them.  *Id.*; *see also* Exhibit 754.  This testimony was material to Kinnison's knowledge about being in a restricted area.

- Kinnison testified that his mood after January 6 was "somber."  *See* Oct. 31 Trial Tr. 60:15–61:10.   In contrast, Kinnison sent messages after January 6 celebrating the riot and forecasting what might happen if they did it again.  Exhibit 548.15.  This testimony was material to Kinnison's consciousness of guilt.

On the basis of Kinnison's false testimony at trial and his criminal obstructive conduct, the Court should apply the two-level enhancement for obstruction of justice.

### *iii.  Mele*

As with Kinnison, Mele also testified falsely at trial regarding material issues, and the Court should impose the obstruction enhancement on that basis.   Among other false testimony, Mele made the following materially false statements during his testimony:

- Mele testified that he could not see certain messages from Russell Taylor in the DC Brigade Telegram group.  *See* Nov. 2 Trial Tr. 68:14–70:25.  But the messages in question were visible on the Telegram group recovered from Mele's own phone, and testimony revealed they would have been visible to him.  Exhibit 866.  Mele's own responses in the DC Brigade only make sense contextually if he had read and was responding to previous messages in the group.  Exhibit 903 ("Damn right I'll be there! Looking forward to meeting you Porter as well as hundreds of thousands more.").   This testimony was material to Mele's advance planning, knowledge of the nature of the DC Brigade, and intent to obstruct.

- Mele testified that he wore his ballistic plate carrier without the plate in the front.  *See* Nov. 2 Trial Tr. 79:22–80:8; 88:13–24.  This is contradicted by photographic and video evidence.  *See, e.g.*, Exhibit 841.  This testimony was material to Mele's willingness to use force and intent to obstruct.

- Mele testified that on January 6, while at the Capitol, he was merely in "spectator mode." *See* Nov. 2 Trial Tr. 114:11–12.  This is contradicted by the video evidence showing Mele advancing on a police line and repeatedly calling for the crowd to "push."  Exhibit 858. This testimony was material to Mele's conduct at the Capitol and intent to obstruct.

- Mele testified that he called out for Kinnison and Martinez to "push" up the hill, rather than against the police.  *See* Nov. 2 Trial Tr. 117:4–13.  But the video makes clear that Mele called out for the crowd to "push" against the police line, while he was facing and moving toward the police, away from Kinnison and Martinez, who were following him.  Exhibit 858; *see also* Exhibit 811 ("I must admit I got caught up in the moment with the whole push push thing!").  This testimony was material to Mele's conduct at the Capitol and intent to obstruct.

- Mele testified that he left the Upper West Terrace after seeing an individual climbing the walls of the Capitol, which upset him.  *See* Nov. 2 Trial Tr. 121:2–4.  In fact, the video evidence shows Mele celebrating the individual climbing the walls.  Exhibit 839.  This testimony was material to Mele's intent to obstruct.

- Mele testified that he did not know he was behind bike racks on the northwest lawn.  *See* Nov. 2 Trial Tr. 128:1–15.  This is contradicted by the video evidence showing bike racks directly in front of Mele on the northwest lawn.  Exhibit 858.  This testimony was material to Mele's knowledge of being in a restricted area.

- Mele testified that he sent a series of messages—including messages discussing the January 6 proceeding and calling for hanging politicians—without reading the contents, and that he had no knowledge of the contents.  *See* Nov. 3 Trial Tr. 30:2–35:8.  This testimony was material to Mele's knowledge of the official proceeding and intent to obstruct.

- Mele testified that he "knew it was time to go when people were actually entering the building."  *See* Nov. 3 Trial Tr. 47:1–2.  But the video evidence revealed that Mele, Martinez, and Kinnison advanced up to the Upper West Terrace *after* learning that Warner had entered the building.  Exhibits 756–757, 859.  This testimony was material to Mele's intent to obstruct.

On the basis of Mele's false testimony at trial, the Court should apply the two-level enhancement for obstruction of justice.

### E.  The Court Should Vary or Depart Upwards

After determining a defendant's Guidelines range, a court then considers any departures or variances.  *See* U.S.S.G. § 1B1.1(a)–(c) and § 1B1.1, cmt. (background).  The Guidelines apply to a "heartland of typical cases."  *Koon v. United States*, 518 U.S. 81, 94–95 (1996).  A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed

"outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole.  *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up). Specific departure statements reflect Commission guidance on what makes a case "atypical" and when departures are "encouraged."  *Koon*, 518 U.S. at 94–95.

Following *Brock*, the enhancements under Guidelines §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply to convictions for 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1512(k), under these circumstances.  But that decision does not undercut the severity of the Defendants' crimes.  If anything, their preplanning, transport of weapons, and storming of the Capitol, followed by their attempted concealment of their conduct, is far more serious than interfering with a routine court proceeding.  *See Brock*, 94 F.4th at 59 ("[I]nterference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work."); *see also* Memorandum Opinion & Order, *United States v. Reffitt*, 21-cr-32, ECF No. 182 at 10 ("Following *Brock*, obstructive conduct is subject to a potential 11-point Guidelines swing depending on whether it interfered with, on one hand, a 'judicial, quasi-judicial, and adjunct investigative proceedings,' or on the other hand, any other type of formal proceeding.   This disparity—though tracking the Guidelines' text—does not reflect the importance and solemnity of the Congressional proceeding to certify the electoral vote count, nor does it reflect the gravity of [the defendant's] obstructive conduct." (quoting *Brock*, 94 F.4th at 51)).  Although the D.C. Circuit has held that Guidelines §§ 2J1.2(b)(1)(B) and (b)(2) do not technically apply to the certification of the electoral vote count, that does not prevent this Court from considering how the uniquely horrifying events of January 6 factor into an appropriate

sentence.

Precisely because the D.C. Circuit held in *Brock* that the Guidelines do not account for this crucial factor, the Court should depart or vary to impose the government's requested sentence.[5] *See e.g.*, *United States v. Bender*, 21-cr-508-BAH, ECF No. 161 at 3 n.1 ("The D.C. Circuit issued an opinion on March 1, 2024 in *United States v. Brock*, No. 23-3045, holding that the sentencing enhancement at U.S.S.G. § 2J1.2(b)(2) does not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the electoral college votes on January 6, 2021, but that decision does not influence the outcome in that case, since the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.").   Indeed, pursuant to *Brock*, which was ultimately a technical dispute over the interpretation of a specific offense characteristic, a person who obstructed justice during a routine court proceeding, causing substantial interference, and even using violence or the threat of such violence, would receive a vastly higher punishment than a person who corruptly intended to stop a proceeding involving the democratic transfer of power inherent to the U.S. Constitution.   That alone warrants an upward variance.

Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the

---

[5] As originally calculated by the United States, applying the enhancements in Guidelines §§ 2J1.2(b)(1)(B) and (b)(2) here, would result in a total offense level of 29 for Warner, Kinnison, and Mele, and 27 for Martinez.   Accordingly, the Guidelines range would have been 87–108 months' imprisonment for Warner, Kinnison, and Mele, and 70–87 months' incarceration for Martinez.

Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure.   U.S.S.G. § 5K2.0(a)(2)(A).   One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[6]  A departure under this provision is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense.  *Id*.  In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."  *Id*.

  Although by its own terms Guidelines § 5K2.7 "ordinarily" does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021, is the type of unusual circumstance that the Sentencing Commission could not have anticipated and that warrants an upward departure.   As the commentary explains, a departure under § 5K2.7 is appropriate if the disruption of a governmental function is "substantial," meaning "substantially in excess" of the disruption ordinarily involved in an obstruction offense.   *See* § 5K2.0 cmt. 3(B)(ii).   Those rioters who obstructed the certification proceedings on January 6 targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy.   They were part of a mob that injured more than one hundred police officers and resulted in more than $2.9 million in losses.[7]   Rioters

---

[6] This Guideline does not require the United States to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."  *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

[7] Given the dangerous circumstances created by the riot, the Court could depart under Guidelines

like the Defendants "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work."  *Brock*, 94 F.4th at 59.   It was an unprecedented day in American history. Surely few, if any, disruptions of governmental functions have been more "substantial," and it was a disruption far "in excess of . . . that which ordinarily is involved in" an obstruction offense, such as impeding a single judicial proceeding.   U.S.S.G. § 5K2.0(a)(3); *id.* cmt. 3(B)(ii).   But, following *Brock*, the seriousness of the crimes committed by rioters like the Defendants is not adequately captured by Guidelines § 2J1.2.   Other courts have applied § 5K2.7 in January 6 cases. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").[8]

    If the Court decides not to apply § 5K2.7, an upward variance to the government's recommended sentence is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors.   An upward variance is appropriate when "the defendant's conduct was more

---

§ 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7.   Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered."   The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already captured by the Defendants' Guidelines ranges, so a departure would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured").
[8] If the Court does apply a departure, the United States requests that the Court also specify that it would have imposed the same sentence as a variance.   *See United States v. Brevard*, 18 F.4th 722, 728–29 (D.C. Cir. 2021) (upholding the district court's sentence where the departure was erroneously applied but the district court indicated that it was also imposing the sentence as a variance).

harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).   Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense.   As discussed throughout this memorandum, the Defendants' obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy.   As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding. . . .  [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86–87.

For the reasons discussed throughout this memorandum, the specific facts and circumstances of this case further support an upward variance to the requested terms of imprisonment.   *See United States v. Fonticoba*, 21-cr-368 (TJK), Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance would be warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *see also United States v. Bender, et al.*, 21-cr-508 (BAH), Memorandum Opinion (March 6, 2024), ECF No. 161 at 3 n.1; *Reffitt*, ECF No. 182 at 9–11. Accordingly, the United States requests that the Court vary upwards in order to give effect to "the

concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).[9]

### F.  The Section 4C1.1 Adjustment for Zero Point Offenders Does Not Apply

The United States agrees with the PSRs that the Guidelines § 4C1.1 reduction does not apply in this case because the Defendants possessed dangerous weapons.   Warner PSR at ¶ 103; Martinez PSR at ¶ 102; Kinnison PSR at ¶ 104; Mele PSR at ¶ 100; *see also* U.S.S.G. § 4C1.1(a)(7) (The adjustment applies only "[if] the defendant meets all of the following criteria: . . . (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense.").   As noted above, the Defendants transported firearms across the country in anticipation of storming the Capitol.   On January 6 itself, the Defendants possessed[10] dangerous weapons, including bear spray, flag poles, and knives, as discussed above, during the riot at the Capitol. Each of these objects is "an instrument capable of inflicting death or serious bodily harm" and is therefore a "dangerous weapon" as defined in Guidelines § 1B1.1 n.1.

---

[9] As the Court knows, the United States sought a two-level upward departure, pursuant to Guidelines § 3A1.4 application note 4 ("Note 4"), against the Defendants' coconspirator, Alan Hostetter.   *See* ECF No. 383.   The Court declined to grant the requested upward departure, but imposed a term of imprisonment of 135 months for Hostetter, pursuant to the Court's analysis under 18 U.S.C. § 3553(a).   For the reasons stated in its sentencing memorandum regarding Hostetter, the United States submits that an upward departure under Note 4 would be appropriate in this case as well, because the Defendants' conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, app. note 4.   However, as noted throughout this section, the United States believes that there are other viable alternatives in addition to Note 4 that would lead to the appropriate sentence recommended by the United States in this case.

[10] The language of Guidelines § 4C1.1 requires only the defendant to have "possessed" a dangerous weapon for the section not to apply, not to have used it.

### G.  Criminal History Category

The U.S. Probation Office calculated each of the Defendants' criminal histories as category I, which is not disputed.   Warner PSR at ¶ 107; Martinez PSR at ¶ 106; Kinnison PSR at ¶ 108; Mele PSR at ¶ 104.   Accordingly, for Warner, Kinnison, and Mele, based on the government's calculation of the adjusted offense level, at 18, the advisory Guidelines imprisonment range is 27 to 33 months' imprisonment.   For Martinez, based on the government's calculation of the adjusted offense level, at 16, the advisory Guidelines imprisonment range is 21 to 27 months' imprisonment.

### V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing is also guided by 18 U.S.C. § 3553(a).   As described below, on balance, the § 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The Defendants' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis.   The Defendants planned with others for weeks to obstruct the official proceeding, as described above.   The nature and circumstances of the Defendants' offenses were of the utmost seriousness, and fully support the government's recommended sentences of imprisonment.

### B.      The Defendants History and Characteristics

The Defendants epitomize disrespect for the law and disrespect for our constitutional order. Lengthy sentences are warranted to ensure that they understand that they have committed serious

crimes that come with consequences, and in order to deter conduct like this again in the future.

### a. Warner

Warner's history and characteristics are most acutely shown through his involvement in the riot at the Capitol on January 6.   It is noteworthy that Warner, uniquely among this group of Defendants, entered the U.S. Capitol building itself through a broken window.   Warner also sought to cover up his conduct after the fact by destroying evidence on his phone.   And while he was destroying evidence, he was laughing at the terror he and his fellow rioters caused, sharing memes from The Shining.   Exhibits 522, 519.   He has never apologized or expressed any regret.

In addition to his criminal conduct and his refusal to acknowledge wrongdoing, Warner's lack of respect for the law is also shown through his objections to his Presentence Report.   In those objections, Warner makes a series of claims squarely refuted by the trial evidence and the jury's verdict.

- Warner claims, "There was no proof or evidence at trial that . . . he saw the guns or knew about them.   No emails, no text message nothing."   *See also* Warner PSR at 30.   This is contradicted by the evidence of Warner's participation in communications with his coconspirators discussing packing firearms.   For example, in Exhibit 603, Warner gave a thumbs up emoji to a discussion of packing a shotgun on the trip.   Exhibit 603.   In Exhibit 606, another individual messaged Warner and his codefendants, telling them to "bring me some toys to play with," with an emoji of a handgun.   Exhibit 606.   Warner responded with an emoji of the American flag.   *Id.*   In a text message among the four defendants, on January 1, 2021, Warner wrote, that another individual "wants to send her personal protection device with us so she doesn't have to put it on the plane…any thoughts?   I can put it in my back pack."   Exhibit 632.09.   But even without all the documentary evidence, Warner's claim that he had no knowledge that he was traveling in a vehicle with six firearms, including a shotgun, and was in a hotel room with five handguns that were moved into and out of a safe, is flatly incredible.   In his testimony, Mele admitted as much.   He was asked about moving his firearms from the van to the hotel safe: "Did you do that secretly or did you do that in front of the others?"   Nov. 3 Trial Tr. 10:22–23.   Mele responded, "Oh, it was visible."   Nov. 3 Trial Tr. 10:24.



*Exhibit 603*



*Exhibit 606*

- Warner claims, "There was no evidence that Mr. Warner came to DC to obstruct congressional proceedings." *See also* Warner PSR at 30. But in light of the overwhelming trial evidence, some of which is discussed above, that is exactly what the jury found, beyond a reasonable doubt, that he did.

- Warner wrote that he "objects to 3 percenters being classified as a militia. Where did this information come from, the government?" *See also* Warner PSR at 30. But Warner does not need the government to characterize the group as a militia, since he already did himself. Exhibit 546.

49

From: 1050044455 Erik Warner (owner)

Thanks Derek.  We didn't really talk about him addressing my situation in the chat. I explained to him why I had to respectfully step aside. I guess he has every right to address my situation with the group.  It really doesn't matter at this point.  I really just don't want to get the group in trouble with any connection to me.  Thanks for sticking up for me.
You know...when your to Punk Rock for the Militia.
I mean Adult Boy Scouts

1/20/2021 4:49:04 PM(UTC-8)

*Exhibit 546*

- Warner claims that he "did not know" either Russell Taylor or Alan Hostetter.   He adds, "Warner had no communications with Taylor or Hostetter."   *See also* Warner PSR at 31.   But Warner joined the DC Brigade and Answer the Call Telegram groups, which were organized by Taylor and Hostetter.   *See, e.g.*, Exhibits 903, 547.04.

- Warner claims that the image of his face imposed into a scene from the movie The Shining, "had nothing to do with Mr. Warner.   There is no evidence that it was a 'celebration.'" *See also* Warner PSR at 31.   It is difficult to conclude that the meme has "nothing to do with Mr. Warner," when his face takes up a third of the image, as he is depicted breaking through a door with an axe.   Exhibits 519, 522.   Warner did not merely receive this message; he forwarded it to another individual with a crying laughing emoji.   Exhibit 519.

Finally, Warner has denied—through his counsel—his association with the Southern California Three Percenters.   Warner PSR at ¶ 121; *see also id.* at 30.   The evidence of Warner's membership in the Three Percenters is overwhelming.   It was repeatedly referenced in the DC Brigade Telegram group.   Exhibit 903.   Warner has also been photographed making Three Percenter hand signs, wearing Three Percenter clothing, and standing with Three Percenter flags on several occasions, including on January 6.   *E.g.*, Exhibits 521, 524, 903.   Photographs of the search of Warner's residence corroborate his membership.

 

Even when Warner stepped away from the Three Percenters, because of the investigation into the riot at the Capitol, Warner not only confirmed his membership, but he specifically referred to the group as a "militia."   Exhibit 546.   Finally, a document recovered from Kinnison's phone includes a list of California Three Percenters, which included all four Defendants.   Exhibit 777.



| CA III% Zone 8 By Area | | | |
|---|---|---|---|
| Last Name | First Name | Phone | Call Sign |
| **AREA B** | | | |
| Kinnison | Derek | | Midnight Rider |
| Martinez | Tony | | Blue Cl' |
| | | | |
| Warner | Erik | | Silver Surfer |
| | | | |
| | | | |
| Mele | Ron | | Redline |
| | | | |

*Exhibit 777*

That Warner would seek to cover up his association with the Three Percenters—which the United States offered at trial as context for his crimes and his association with his codefendants—after a

51

lengthy trial with such significant evidence to prove it underscores his lack of respect for the Court.

In light of all these circumstances, Warner's history and characteristics counsel in favor of a significant term of incarceration.

### b. Martinez

As set out above, Martinez's character was on full display at the U.S. Capitol on January 6. What's more, even after the events of January 6, Martinez was celebrating his conduct—including by talking about making t-shirts to commemorate the group's role in the riot. Exhibit 878. Martinez celebrated despite knowing that he had committed a crime on January 6, 2021. On January 9, 2021, another individual texted Martinez, "Did you storm the castle," to which Martinez responded, "I'm standing on the 5th," referring to his Fifth Amendment right not to incriminate himself. Exhibit 623. For all the reasons set out above, Martinez's conduct was extremely serious and worthy of a significant term of imprisonment.

In addition to the evidence established at trial, Martinez's personal characteristics are shown on the Twitter account that he operates. Martinez's Twitter posts were not introduced at trial, but they are worthy of mention here. In particular, Martinez's social media posts from early January 2021 are illuminating. While on the road from California, Martinez made posts indicating that he was traveling to Washington, D.C. and reflective of his understanding of the congressional proceeding and that then-Vice President Pence would be present.



Martinez also tweeted about the Defendants' conduct on January 4, 2021. Contrary to testimony from Kinnison and Mele, who both testified that the group's firearms never left the hotel, *see* Oct. 30 Trial Tr. 169:1–2 (Kinnison: "Those firearms did not leave that hotel room until we left DC."); Oct. 31 Trial Tr. 91:14–19 (Kinnison); Nov. 2 Trial Tr. 53:6–22 ("Q. At any time, during that period of time, did you take your firearms out of that safe to transport them anywhere other than the immediate proximity of your safe? A. [Mele] No, sir, not until checkout."), Martinez referenced "packing iron" on the night of January 4.



Martinez has also used Twitter to embrace his January 6 conduct, promote dangerous conspiracy theories about the riot, and to celebrate other rioters.   For example, on January 25, 2021, Martinez retweeted a post that awarded rioters with a "Fresno Patriots of the Year Award."



On January 6, 2024, after having been found guilty of all charges by a jury, Martinez responded to a post with a video from the riot, which read, "3 years ago today!   God Bless Our Patriots!   #J6 #Fedsurrection #MAGA2024."   Martinez responded by calling January 6 "the greatest yet most bitter memory I have."



Other posts since his conviction echo the same sentiment: that Martinez is proud of his riotous conduct and has no regrets.







Like Warner, the objections filed to the PSR by Martinez are so divorced from reality as to reflect a lack of respect for the Court.   Martinez objects that the "trial evidence [did not] show that he planned to do anything other than attend the 'Stop the Steal' rally."   Martinez PSR at 28. But it was Martinez who, on January 3, said he was traveling to Washington, D.C. to "[r]aise some hell son."   Exhibit 633.01.   Martinez also objects that "trial evidence did not show his involvement in firearms."   Martinez PSR at 28.   But, in addition to his participation in messages among the Defendants about firearms, it was Martinez who joked to a friend that his group was "packing light just a scatter gun and a pistol a piece."   Exhibit 627.   Martinez corroborated his involvement on Twitter on January 5, when he talked about "packing iron," as noted above.

In light of these circumstances, Martinez's history and characteristics counsel in favor of a significant term of incarceration.

### c. Kinnison

Kinnison's history and characteristics also counsel in favor of a lengthy term of imprisonment. The Court had the opportunity to get to know Kinnison through his trial testimony. The Court met a defendant who had no remorse for his conduct on January 6 and clearly felt entitled to do it again.

Kinnison's false statements are discussed in detail above, but one warrants additional emphasis here. Kinnison's primary defense at trial was that he—and the rest of the DC Brigade— were "just trying to protect others." Oct. 30 Trial Tr. 147: 9–10; *see also* Oct. 30 Trial Tr. 131:25– 132:1 ("I joined the big California to DC group with the heart and the intent of security."), 143:25 ("[W]e were going there to work security."). He even talked about wanting to protect police on January 6. Oct. 31 Trial Tr. 49:5–16. But, of course, that's not what Kinnison did on January 6. Instead, Kinnison, along with Mele and Martinez, stood by as an officer was viciously assaulted. He did nothing to stop it and nothing to assist the officer. Oct. 31 Trial Tr. 97:13–98:9. When asked why he did not help the officer, Kinnison said, "At that moment, my mindset in going through what I had gone through on January 4th, January 5th, I didn't know how to read these officers." Oct. 31 Trial Tr. 43:14–17. Kinnison mused that maybe he was "guilty of a sin of omission." Oct. 31 Trial Tr. 44:10–11.[11] Time after time, if Kinnison was the patriot and protector he portrays himself to be, he had the opportunity to show it. He never did. He saw

---

[11] At another point, when asked about this same assault, Kinnison turned to the jury and said, "I just want to apologize, because he is just insulting your guys' intelligence. His whole case is that I failed to help one police officer in one instance." Oct. 31 Trial Tr. 178:20–179:22. He had to twice be admonished by the Court to answer the question. *Id.*

rioters throwing water bottles at police, but he did nothing.   Oct. 31 Trial Tr. 93:13–94:9.   He saw rioters throwing chairs and pepper spraying police, but he did nothing.   Oct. 31 Trial Tr. 94:11–97:12.   In fact, in moments of his testimony, he revealed that he was too distracted by trying to determine the ideological allegiance of the rioters.   Oct. 31 Trial Tr. 44:24–25 (referring to rioters scaling the walls, "[I]t was like, okay, are these good people?  Bad people?  Is this Antifa?  Is this angry people?"); Oct. 31 Trial Tr. 96:18–19 (referring to rioters throwing chairs and water bottles at police, "[W]e were still trying to figure out what was going on, who was a good guy, who was a bad guy.").   As if the political affiliation of the rioters assaulting police and storming the seat of democracy would make any difference.

Of course, Kinnison had no explanation for his continued march against the police line, as it was forced to retreat from the northwest lawn, or his subsequent ascent to the Upper West Terrace, where he stayed for hours.   He had no explanation, because he has no regret.

Kinnison's character is also revealed in his false statements to his pretrial release supervisor.   As the United States has separately raised, Kinnison violated his pretrial release conditions by traveling out of his district of supervision without providing the honest, required notice to his Pretrial Services Officer.   And while this may have been excused as a mere mistake or momentary lapse, when specifically asked about this travel by his Pretrial Service Officer, Kinnison chose to lie about it, showing his lack of respect for the Court.   This conduct is discussed more fulsomely in the United States' Notice of Pretrial Release Violation, of February 14, 2024. ECF No. 420.

In light of these circumstances, Kinnison's history and characteristics counsel in favor of a significant term of incarceration.[12]

### d. Mele

Mele's history and characteristics similarly counsel in favor of a lengthy term of imprisonment.   To know the character of Mele, the Court should look at his trial testimony.   As noted above, Mele's trial testimony was stunningly inconsistent with the reality of the evidence, reflective of a lack of respect for the Court and the process.   At every opportunity, Mele obfuscated the truth and attempted to mislead the jury.   For example, he talked about the "fire starting" and "shelter building" trainings he participated in with the Three Percenters, Nov. 2 Trial Tr. 62:9–16, but forgot to mention the firearms and close quarter combat training, Nov. 3 Trial Tr. 22:23–24:6.   He mentioned bringing "[a] cooler with drinks, [a] suitcase, and my duffel bag as well as, my pillow" to Washington, D.C., Nov. 2 Trial Tr. 62:9–16, but he needed to be reminded about the firearms he packed and transported, Nov. 3 Trial Tr. 10:25–11:13.   When asked what he carried in his plate carrier on January 6, Mele forgot at first to mention the bear spray.   Nov. 2

---

[12]  The Presentence Report notes that Kinnison has received "extremely explicit hate mail . . . since his conviction in the instant case.   The various letters and messages convey derogatory and violent sentiments toward the defendant [and his family members]."   Kinnison PSR at ¶ 123.   Kinnison filed examples of such messages in the Defendant's Sentencing Position, some of which have been placed under seal.   ECF No. 433.   While the receipt of these messages provides no grounds at all for a lesser sentence under the Guidelines or under the § 3553(a) factors, it goes without saying that any such communications are condemnable and should never happen.   While the defendant has rightly been convicted of serious offenses related to an event of national significance, that is no cause for attacks or harassment on any individual—including the defendant and *especially* his family—from members of the public.   The defendant has to answer to this Court at sentencing, and to this Court alone.   There is no place in the process for members of the public to harass criminal defendants, and certainly not with messages of violence.

Trial Tr. 81:19–82:1; 84:22–85:1.   Mele testified on direct examination that he did not carry a specific knife at the Capitol, Nov. 2 Trial Tr. 89:14–89:18, but he neglected to mention that he had, in fact, carried *other* knives on his person at the Capitol, Exhibit 882.

Mele's post-trial statement contained in the Presentence Report is certainly not to his credit either.   Mele PSR at ¶ 80.   Mele's statement uses a tone of remorse, but never actually gets there. His statements of regret are a mile wide and an inch deep.   Rather than acknowledging his wrongdoing and accepting responsibility, Mele's statement contains the same minimization and falsehoods that characterized his trial testimony.   For example, Mele writes, "it took me to get to the top of the stairs to see what exactly was happening at the Capitol that prompted my eagerness to leave right away."   *Id.*   Mele also claims, "I chose not to enter the Capitol nor did I choose to remain outside for hours.  I wanted to leave and did."   *Id.*   No he didn't.   As an initial matter, Mele joined Martinez and Kinnison and going to the Upper West Terrace specifically *because* they had learned Warner and others had successfully broken into the building.   Exhibit 859; *see also* Exhibit 757.   And when he arrived and saw rioters scaling the walls, he cheered and celebrated. Exhibit 863.   And when he did leave the Upper West Terrace, it was not with disgust or regret. He was continuing to celebrate, holding up his can of Twisted Tea to the rioters below and cheering them on.   Exhibit 326.01.   And after exiting the stairs, Mele did, in fact, stay on Capitol grounds for hours.   Exhibit 333.01; *see also* Nov. 2 Trial Tr. 123:2–3 (Mele testifying that he got back to the hotel at 5:50 p.m.).

In his statement, Mele adds that he is "continuing to learn from my mistakes."   Mele PSR at ¶ 80.   But in his statement, he never admits precisely what he did wrong.   There is no apology

for the collection and transportation of weapons.   There is no apology for falsely testifying.   There is no apology for advancing against a police line and repeatedly calling for the crowd to "push!"   Exhibit 858.   Far from apologizing, Mele never even acknowledges that this event happened.   That deliberate choice to struthiously ignore those despicable moments echoes his trial testimony.   Nov. 2 Trial Tr. 117:4–13, 129:19–131:13.[13]   Mele's selective memory of these moments is incredible, given that—on January 6 itself—he acknowledged to his wife "I got caught up in the moment with the whole push push thing!"   Exhibit 811.

---

[13] At trial, Mele minimized the experience of officers who had testified about these moments. One officer present described officers being "scared for their lives" or "wondering if they are ever going to make it home":

> You know, there you think about it and you talk about it and I have never been in war, but this was something that was for me, this was war like.   When your own -- you know, your own people, your own American people are trying to attack the government building and attack you as an officer and all you are trying is trying to -- all you are trying to do is protect people.   Whether you like the people or not, all that we are trying to do is protect them, just like we would protect these people if someone was trying to hurt them and their families.   And I don't think they cared.   They wanted to do whatever they wanted to do. And, you know, just because there wasn't as much physical activity or as much violence from the police officers as there could have been does not mean the police officers weren't nervous or scared for their lives or scared for their family wondering if they are ever going to make it home.   Like I said, you see people dressed like this, you see people moving on you with their aggressive nature, you have no clue what these people are capable of.

Oct. 19 Trial Tr. 162:18–163:10.   Another officer testified about feeling "hopeless" in those moments.   Oct. 26 Trial Tr. 50:17–22 ("[A]t the time I felt hopeless.   And just it is hard to watch because as an officer you are there to, you know, protect members of Congress and prevent any, like, harm from happening.   And I just felt like I couldn't do my job that day because of what was occurring in the crowd.").   Mele was asked on cross examination, "Do you understand that at this moment, officers were in fear for their lives?"   But he did not acknowledge the officers' fear, and simply said, "I understand it to be a terrible situation."   He then immediately pivoted to his own suffering: "There are people throwing chairs and objects and metal bike racks and smacking me in my back or my legs and I wanted to get around it."   Nov. 2 Trial Tr. 130:5–10.

The defendant's carefully worded statement and his trial testimony confirm that, to this day, he has no regrets and is proud of what he did on January 6.   When he was asked at trial about the can of Twisted Tea he carried on January 6—an object each of the four Defendants carried as they stormed the Capitol—Mele could not help but reveal that he saw the can as a trophy from January 6: "I am keeping it forever," Mele told the jury.   Nov. 2 Trial Tr. at 86:2–3; *see also* Nov. 3 Trial Tr. at 72:9–14.   That testimony is consistent with the man who extensively bragged about his role in the riot on January 6 and who awarded a "Capitol Action Badge" to his fellow rioters.

In light of all these circumstances, Mele's history and characteristics counsel in favor of a significant term of incarceration.

**C.     The Need for the Sentence Imposed To Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.   The Defendants' crimes were an attack on not just the Capitol, but the United States and its system of government.   They joined a mob and struck a blow to a central feature of the American system: the peaceful transfer of power.

This crime is particularly serious, because the Defendants have been convicted of engaging in a criminal conspiracy.   In another case, Judge Mehta elaborated on the particularly insidious nature of a conviction for a count of conspiracy.   The Court referenced *Callanan v. United States*, 364 U.S. 587 (1961), which states:

> Collective criminal agreement, partnership in crime presents a greater potential threat to the public than individual dealings.   Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality.

> Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish.   Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked.   Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed.   In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.

*Id.* at 593–94; *see also United States v. Rhodes*, 22-cr-15, Sent. Tr. 5/25/23 at 111:17–112:7.   It bears emphasis that these defendants are in a rare class of defendants convicted of a conspiracy whose object was to obstruct the normal functioning of the government.   As with the Proud Boys and Oath Keepers, this places these Defendants in a different category—one presenting a "greater potential threat to the public," *Callanan*, 364 U.S. at 593.   As Judge Mehta explained:

> This is an additional level of calculation.   It is an additional level of planning.   It is an additional level of purpose.   It is an additional level of targeting, in this case, an institution of American democracy at its most important moment, the transfer of power.   That's pretty significant.

Sent. Tr. 5/25/23 at 79:12–25.   The same is true here.   These Defendants did not come for a protest and unexpectedly find themselves at a riot.   They collected weapons and planned together to obstruct the certification proceeding, and that is exactly what they did.

While the Defendants, have attempted to wrap themselves in the American flag and draw comparisons to the American revolution of 1776, as this Court has noted elsewhere, the attack on the Capitol "was not patriotism; it was the antithesis of patriotism."   Notes for Resentencing, *United States v. Little*, 21-cr-315-RCL, ECF No. 73.   A lengthy term of incarceration is necessary to reflect the seriousness of these crime and to promote respect for the law.

**D.      The Need for the Sentence To Afford Adequate Deterrence**

As the Court noted recently in another sentencing, "January 6 must not become a precedent for further violence against political opponents or governmental institutions.   This is not normal. This cannot become normal.   We as a community, we as a society, we as a country cannot condone the normalization of the January 6 Capitol riot."   Notes for Sentencing, *United States v. Johnatakis*, 21-cr-91-RCL, ECF No. 272.   Accordingly, "[w]hen sentencing a person convicted for January 6 offenses, the Court aims to discourage these defendants from future violence, dissuade others from taking inspiration from the Capitol riot, and express the community's moral disapproval of this conduct."   *Id.*

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[14]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to these Defendants also weighs heavily in favor of a lengthy term of incarceration.   As discussed in detail above, the Defendants have never taken responsibility or expressed regret for their conduct on January 6, 2021.   Instead, they have celebrated their conduct.   They have portrayed themselves as victims of political

---

[14] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

persecution.   Their lack of remorse and continued embrace of their conduct undermines any last-minute claims of remorse they may offer.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29–30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

The certification of the Electoral College vote takes place every four years.   Nothing in the Defendants' conduct or statements to date suggest they will not come back for the next certification they disagree with, to engage in the same dangerous and obstructive conduct.   The Defendants must be deterred.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like."   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience,

guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the § 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will

sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id.* at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here,[16] the most useful comparator for the Court to consider is that of Alan Hostetter—a charged codefendant and coconspirator already sentenced by this Court.[17] Like the Defendants, Alan Hostetter was convicted of § 1512(k) and § 1512(c)(2) offenses.   For those offenses, this Court imposed a sentence of 135 months' imprisonment, at the top of the calculated Guidelines.   In the main, there are notable similarities between these DC Brigade defendants.   Like Hostetter, the Defendants joined the DC Brigade Telegram group to act as a

---

[15] Importantly, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, 22-cr-31 (FYP), Sent. Tr. 8/26/22 at 24–25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[16] A routinely updated table providing additional information on the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.   To reveal that table, click on the link, "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the recommended sentence in this case would not result in an unwarranted sentencing disparity.

[17] In addition to Hostetter, the United States would refer the Court to the cases of other defendants convicted of § 1512(k) or § 371 conspiracy offenses related to January 6, 2021, including the Oath Keepers, 1:22-cr-15 (APM), and Proud Boys, 1:21-cr-175 (TJK), conspiracy cases, both of which also included 18 U.S.C. § 2384 (Seditious Conspiracy) charges, and a § 371 conspiracy case focused on another group from California, *United States v. Rodriguez, et al.*, 21-cr-246 (ABJ). For further discussion of these cases, the United States refers the Court to the Government's Sentencing Memorandum filed regarding Alan Hostetter.   *See* ECF No. 383, at 51–53.

"group of fighters" on January 6, 2021.   Like Hostetter, the Defendants collected weapons and drove from California to Washington, D.C. for the specific purpose of transporting those weapons. Like Hostetter, the Defendants joined with others in marching to the U.S. Capitol, advanced past police lines, and held ground at the U.S. Capitol, in defiance of police commands, for hours.   Like Hostetter, the Defendants carried weapons onto Capitol grounds.   Like Hostetter, each of these Defendants celebrated and bragged about their role in the riot.   And to this day, like Hostetter, not a single one of these Defendants has accepted responsibility or offered a sincere statement of regret or a commitment to never do this again.

There are two primary distinctions between Hostetter's conduct and those of the Defendants here—each of which is taken into account in the government's sentencing recommendation.   First, Hostetter was an organizer and leader of the DC Brigade conspiracy, and received a two-level adjustment for an aggravating role.   The United States is not seeking an aggravating role enhancement against these Defendants.   Second, Hostetter was a visible leader of obstruction efforts and repeatedly publicly called for political violence, including executions, which these Defendants have not done.   Hostetter's public calls for political violence in the run up to January 6 were a significant aggravating factor in his case.   The United States has taken the absence of this factor into account in these cases by recommending lower sentences for these Defendants.

Other distinctions between Hostetter and these Defendants are minor and not worthy of significant weight.   Hostetter was charged and convicted of § 1752(b)(1)(A) felony offenses, because he carried a hatchet in his backpack at the Capitol.   While the Defendants were not

68

charged with violating § 1752(b)(1)(A), they did each carry weapons on the Capitol grounds. And unlike Hostetter, whose hatchet (as far as the evidence has shown) remained in his backpack, the Defendants' carrying of weapons such as bear spray and knives, like their use of tactical gear, was open and visible to the law enforcement they engaged with.

In ways, the Defendants' crimes were more severe than those of Hostetter.   Hostetter never entered the Capitol building itself.   Warner broke into the Capitol building, and Martinez, Kinnison, and Mele each moved to try to join him when they heard the news.   And while the Court rightly applied a Guidelines § 3C1.1 enhancement for Hostetter, he was never convicted of violating 18 U.S.C. § 1512(c)(1), an additional offense both Kinnison and Warner have been convicted of.

## VI.    FINE

The Defendants' convictions subject them to statutory maximum fines of $250,000 (for Counts One and Two, and Counts Seven and Eight for Kinnison and Warner, respectively) and $100,000 (for Counts Five and Six).   *See* 18 U.S.C. § 3571(b)(3); *see also* U.S.S.G. § 5E1.2(a). In determining whether to impose a fine, the Court should consider a defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."   *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

A fine is appropriate in this case.   Each of these Defendants has sought to "capitalize" on their crimes by raising funds through public fundraising efforts.

- To date, Warner has raised at least $15,827.   Warner PSR at ¶ 150.   Warner raised this amount, as of August 31, 2023, through a GiveSendGo account set up by his wife—"Erik Warner Defense Fund."   The GiveSendGo account claims, "All of the money that is raised will be utilized to help Erik with his legal defense."   But at a July 20, 2023 hearing before this Court, Warner's counsel represented this was not the case: "[T]here haven't been any legal -- there is an implication that legal fees here have been paid with some GoFundMe page.   I'm going to swear to this Court under oath right now, if you want to put me under oath, that I have never received any fees from some GoFundMe page that somebody has raised."   July 20 Hearing Tr. 113:17–22.   At some point following August 31, 2023, the GiveSendGo account was taken down and is no longer publicly available.   Counsel for Warner was appointed on June 14, 2021.   *See* Minute Entry of June 14, 2021.

- To date, Martinez has raised $30,315.   Martinez PSR at ¶ 139.   Martinez raised this amount directly through a GiveSendGo account—"Defense for a disciple of Christ." Martinez references his legal representation, but never explicitly states that is what the requested funds are for.   Instead, he calls on his audience, "if you, a fellow patriot, would like to invest in someone who's Biblically and historically educated and will fight until God calls me to, then please invest." [18]   Since the draft PSR was filed, Martinez's GiveSendGo account was taken down and is no longer publicly available.   Counsel for Martinez was appointed on August 16, 2023.   *See* ECF No. 298.

---

[18] In a stunning lack of self-awareness, Martinez, who stormed the Capitol carrying bear spray and wearing a ballistic plate carrier, chose to complain in his GiveSendGo that federal law enforcement was "[t]actically geared" when they searched his home.

70

- To date, Kinnison has raised $48,491.  Kinnison PSR at ¶ 150.  Kinnison raised this amount directly through a GiveSendGo account—"Christian Patriot Legal Fees."  Though Kinnison claims the account is "for legal defense fees," he has used this public platform to promote lies about the January 6 attack on the Capitol, claiming "the American people and the capital police were setup on this false flag event to weaponize the government against conservatives."  Counsel for Kinnison was appointed on October 31, 2023, though defense counsel recently sought to withdraw that CJA appointment.  *See* ECF Nos. 361, 433.

- To date, Mele has raised $39,402.  Mele raised this amount through two separate GiveSendGo accounts—"Ron Mele Christian Patriot Defense Fund" and "Persecuted Patriot Relocated Family for Work."  The first account was set up by Mele's wife and claimed to be "for his Legal Defense Fees."  His account falsely asserts that Mele's attendance at the Capitol riot was entirely "peaceful."  While the account appears set up by Mele's wife, certain update posts are phrased in the first person, consistent with language coming directly from Mele.  As of August 30, 2023, this account had raised $34,202.  It is no longer publicly available.  A second account was created by Mele himself, seeking to raise funds for his family.  Mele expressly contrasted this account with his other fundraiser: "Every dollar there went to my attorney to defend me from the multiple charges on my indictment for just being present that day."  This account has raised $5,200.  Mele PSR at ¶ 148.  Counsel for Mele was appointed on March 2, 2023. *See* ECF No. 175.

71

The Defendants have raised tens of thousands of dollars based on their participation in a riot and lies about their conduct on January 6, 2021.   They should not be able to retain a windfall from the prominent role of their criminal conduct.   The United States recommends that the Court impose fines consistent, at least, with the amount raised by the Defendants in these fundraising activities.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.   § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).   *See Fair*, 699 F.3d at 512 (citation omitted).   Because the Defendants were convicted of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as a person directly and proximately harmed as a result of the offense of conviction.  *See Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23–24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[19]

Because the Defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution

---

[19] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

and hold the Defendants responsible for their individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476–77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court . . . may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require each Defendant to pay $2,000 in restitution for their convictions.  This amount fairly reflects each Defendant's role in the offense and the damages resulting from their conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.  Specifically, here, the Court ordered restitution in the amount of $2,000 in its sentencing of the Defendants' coconspirator and codefendant Alan Hostetter.  ECF No. 384 at 7.  Accordingly, such a restitution order avoids sentencing disparity.

74

## VIII.   CONCLUSION

For the reasons set forth above, the United States recommends that the Court impose a lengthy term of imprisonment for each defendant.   Specifically, Warner, Kinnison, and Mele should serve 96 months, and Martinez should serve 78 months.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/ Anthony W. Mariano*
ANTHONY W. MARIANO, MA Bar No. 688559
JASON M. MANNING, NY Bar No. 4578068
TERENCE A. PARKER, NY Bar No. 5775192
Trial Attorney, Detailees
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, DC 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov
(202) 514-6256
Jason.Manning@usdoj.gov
(202) 803-1600
Terence.Parker3@usdoj.gov