**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 21-cr-392-RCL |
| | ) |
| FELIPE ANTONIO MARTINEZ, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**SENTENCING MEMORANDUM OF FELIPE ANTONIO MARTINEZ**

Martinez traveled with his friends from California to Washington, D.C., to attend the former president's political rally on January 6.  After making their way to the Capitol amidst a large crowd, they witnessed a chaotic scene where protesters assaulted law enforcement officers. Martinez walked up a flight of stairs and stood near a Capitol Building doorway on the Upper West Terrace, as the mob pushed inside the building.  The group loitered around the premises for a period of time and then left.  For this conduct, a jury found Martinez guilty of a federal conspiracy to obstruct an official proceeding, obstruction of an official proceeding, and two Class A misdemeanors.

Martinez sincerely regrets his presence at the Capitol that day.  He apologizes for his contribution to the chaos.  He went to trial not to avoid responsibility for his conduct but because the obstruction-of-justice crime with which he was charged had never been applied before January 6 to protest conduct unrelated to evidence impairment.  Martinez's adjusted offense level under the Guidelines should be calculated at 14, as the specific offense characteristic at U.S.S.G. §2J1.2(b)(3) does not apply for several reasons.  Martinez is a "zero-point offender," under the new adjustment at §4C1.1, and thus his total offense level is 12.  That leaves a Guidelines range

1

of 10-16 months' incarceration.  The Court should not depart upward under U.S.S.G. §3A1.4, as the convictions are not federal crimes of terrorism and application note 4 is inconsistent with the unambiguous text of the guideline and its authorizing legislation.  The Court should not vary upward to account for differences between Martinez's sentencing range and those in other § 1512(c) Capitol riot cases, as disparities between the instant case and ones where sentences were imposed contrary to law are not "unwarranted."

Given the novel and uncertain nature of the § 1512(c) offense, the very low probability that Martinez will recidivate, and the need to avoid unwarranted sentence disparities with the Court's comparable Capitol riot cases, Martinez respectfully requests a sentence of 12 months and a day of incarceration, 200 hours' community service, and $2,000 in restitution.

**Factual background**

> **A.    Martinez's background, family, employment history, and character**

Martinez, 50, was born and grew up in California.  When he was still a young child, his parents divorced, and Martinez was raised by his mother.  He never saw his father again.  Although Martinez's mother remarried, his relationship with his stepfather was "nonexistent."  Presentence Investigation Report (PSR), dated Mar. 13, 2024, p. 16.

After graduating high school, Martinez entered the workforce. Between approximately 2003-2017, he was an apprentice in construction worker unions in California.  PSR, p. 19.  His specialty is pipefitting (also known as steamfitting).

In 2001, Martinez married.  He and his wife have raised three children together, two daughters (age 16 and 10) and a son (age six).  PSR, p. 17.  In December 2022, the couple separated due to marital issues and the strain brought on by this case.  Although Martinez is not court-ordered to pay child support, he has been placing about $1,000 a week into a joint account

with his wife.  In the couple's informal custody arrangement, Martinez may see his children every other week.

In his interactions with Martinez over the past couple years, counsel has found him to be polite, self-possessed, and good-humored.  Despite all the pressure from a serious federal indictment and trial, counsel has never seen Martinez lose his temper or even his cool.  Martinez has not once wavered in his sunny outlook on life.  Counsel believes that Martinez joined the Three Percenters group for friendship, and out of a need to belong to a fraternal organization (in some ways akin to the labor unions to which he belonged), not because he is a violent extremist. Counsel has seen no indication in Martinez's behavior or conversation that would suggest he is capable of violence for any reason, much less for political ones.

**B.      The convictions and presentence investigation report**

Between October 12, 2023 and November 8, 2023, the Court conducted a jury trial. Martinez was found guilty of the following charges: conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count One); obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) (Count Four).

The PSR identifies U.S.S.G. §2J1.2 as the controlling guideline.  PSR, ¶ 91.  The base offense level is 14.  *Id.*, ¶ 93.

The PSR applied the two-level specific offense characteristic at §2J1.2(b)(3) because "the offense was otherwise extensive in scope, planning or preparation ((to wit: the defendants entered into a conspiracy to obstruct congressional proceedings. Weeks prior to January 6, 2021,

3

the conspirators began planning their travel, collecting weapons, and then driving cross-country to transport weapons and tactical gear to take to the Capitol)." PSR, ¶ 95.

Thus, the PSR calculated Martinez's total offense level at 16.  In Criminal History Category I, that would generate a Guidelines range of 21-27 months' incarceration.  PSR, ¶ 147.

The PSR suggested that (1) an upward variance might be justified to "avoid unwarranted sentence disparity among similarly situated defendants," PSR, ¶ 177; and (2) an upward departure may be warranted under the terrorism enhancement, U.S.S.G. §3A1.4, application note 4.  *Id.*, ¶ 175.[1]  Martinez objected to application of §2J1.2(b)(3) and to upward variances or departures.

**Argument**

## I.    Sentencing procedure

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements.  It may make its own policy judgments, even if different from those in the Guidelines.  *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.  As the Court knows, the cardinal requirement of § 3553(a) is that the "court

---

[1] In an amended PSR, dated Apr. 11, 2024, the Probation Office added two additional bases for a potential upward departure: (1) significant disruption of government function, U.S.S.G. §5K2.7; and (2) national security, public health or safety were significantly endangered, §5K2.14.  PSR, ¶ 175a.

shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

## II.      The PSR incorrectly applied U.S.S.G. §2J1.2(b)(3)

The PSR applied the two-level specific offense characteristic at U.S.S.G. §2J1.2(b)(3) because "Weeks prior to January 6, 2021, the conspirators began planning their travel, collecting weapons, and then driving cross-country to transport weapons and tactical gear to take to the Capitol)." PSR, ¶ 95. Legally and factually, that is a mistaken analysis.

The relevant Guideline provides,

> If the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation, increase by 2 levels

§2J1.2(b)(3).

First, the specific offense characteristic does not apply as a matter of law.  The first two subsections are expressly limited to object evidence.  The "otherwise clause" in subsection (C) follows immediately after the list of object-impairment offenses.  Under the canons of ejusdem generis and noscitur a sociis, the offense in subsection (C) should therefore be read to constitute a crime similar in kind and degree of obstruction to the previous examples.  *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591, 604 (2015).  Martinez's offense did not involve object evidence impairment (or any other kind of evidence).  Accordingly, subsection (C) does not apply.

Second, the enhancement does not fit the facts.  The government must establish not just some conduct that is "extensive in scope, planning, or preparation" but that the *offense* had those qualities.  No evidence at trial showed that Martinez's "plans to travel" to D.C. entailed an agreement to obstruct Congress.  To the contrary, every piece of evidence showed that Martinez

5

planned to attend the former president's rally at the Ellipse.  The mere fact that Martinez was convicted of conspiracy does not establish extensive planning or preparation, as the jury could have found a real-time, in-the-moment "conspiracy" that was reached outside the Capitol Building.  Indeed, the government argued that point to the jury.  None of the relevant pre-January 6 communications to which Martinez was a party said anything about occupying the Capitol Grounds or Building.

Nor, of course, did the evidence show that Martinez planned "to transport weapons and tactical gear" to the Capitol.  To the contrary, trial established that other co-defendants decided to bring weapons to D.C., not Martinez.  No witness or trial exhibit demonstrated that Martinez encouraged or condoned that decision.  Defendant Kinnison positively testified that he decided to give the tactical vest to Martinez after they arrived in D.C.

Accordingly, the government has not presented any evidence to satisfy §2J1.2(b)(3), much less a preponderance of the evidence.

## III.   The Court should not vary or depart upward

The PSR suggested that (1) an upward variance might be justified to "avoid unwarranted sentence disparity among similarly situated defendants," PSR, ¶ 177; and (2) an upward departure may be warranted under the terrorism enhancement, U.S.S.G. §3A1.4, application note 4.  *Id.*, ¶ 175.  Both positions are erroneous.

**Upward variance to avoid unwarranted sentence disparity**.  The Court must avoid "unwarranted" sentence disparities among defendants with similar records who have been found guilty of similar conduct.  18 U.S.C. § 3553(a)(6).  The PSR appears to suggest that because other Capitol riot defendants who have been convicted under § 1512(c)(2) received terms of incarceration higher than Martinez's Guidelines range due to application of the interference-

with-the-administration-of-justice specific offense characteristics in U.S.S.G. §2J1.2(b),

Martinez should receive a similar sentence.  That view is mistaken.  The standard is not whether

any sentence disparity exists but whether it is "unwarranted." The § 1512(c) defendants

sentenced under the administration-of-justice enhancements received punishments pursuant to an

erroneous Guidelines calculation.  *United States v. Brock*, 94 F.4th 39, 54-58 (D.C. Cir. 2024).

Thus, a sentence for Martinez falling within a properly calculated Guidelines range would not

and cannot constitute a disparity that is "unwarranted."

**An upward departure under the terrorism enhancement would be erroneous.**  The

terrorism enhancement adjustment increases the offense level by 12 levels, with a minimum level

of 32, and elevates the defendant to criminal history category VI .  U.S.S.G. §3A1.4.  It is the

most severe sentencing enhancement in the Guidelines.  It applies only "if the offense is a felony

that involved, or was intended to promote, a federal crime of terrorism. . ." *Id.*  Federal crimes of

terrorism are listed in 18 U.S.C. § 2332b(g)(5).  The crimes of conviction here are not federal

crimes of terrorism and in any case, the facts do not satisfy the guideline.

Commentary to the Guidelines states that the Court may still apply the terrorism

enhancement as an upward departure, as "there may be cases in which (A) the offense was

calculated to influence or affect the conduct of government by intimidation or coercion, or to

retaliate against government conduct but the offense involved, or was intended to promote, an

offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B)."

§3A1.4, cmt. n. 4.  As other judges in this district have determined, in the context of the January

6 cases, this application note is unenforceable.  *U.S. v. Nordean*, 21-cr-175-TJK, 9/1/23

Sentencing Hr'g (declining to apply application note 4 to §3A1.4 in Proud Boys case).[2]

---

[2] The Court did apply §3A1.4 but only to a conviction on an offense listed in § 2332b(g)(5).

Application Note 4 is policy commentary that expands §3A1.4 and is therefore not entrusted to the Sentencing Commission acting unilaterally via application notes. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019); *Stinson v. United States*, 508 U.S. 36 (1993).

The Supreme Court has held that commentary "that interprets or explains a Guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that Guideline." *Stinson*, 508 U.S. at 38. And, under a doctrine known as *Auer* deference, courts should defer to an agency's (the Commission's) reasonable reading (here, the commentary) of an ambiguous regulation (the Guidelines). *Kisor*, 139 S. Ct. at 2408. However, the Supreme Court recently made clear that "a court should not afford *Auer* deference unless the regulation is *genuinely* ambiguous." *Id.* at 2415. (emphasis added).

After *Kisor*, the Third Circuit sitting *en banc* opined, "[i]f the Sentencing Commission's commentary sweeps more broadly than the plain language of the guideline it interprets, we must not reflexively defer. The judge's lodestar must remain the law's text, not what the [Sentencing] Commission says about that text." *United States v. Nasir*, 17 F.4th 459, 472 (3rd Cir. 2021) (concurrence). Post-*Kisor*, other courts have also acknowledged they are troubled by "[t]he Commission's prior attempts to use its interpretive authority to improperly change the scope of a Guideline provision." *United States v. Kirilyuk*, 29 F.4th 1128, 1136–37 (9th Cir. 2022) (cleaned up). The Third Circuit recently applied its rationale in *Nasir* to its holding in *United States v. Banks*, 55 F. 4th 246, 528 (3rd 2022). There, in the fraud guideline, the Third Circuit invalidated Note 3(A)'s definition of "loss" as "the greater of actual loss or intended loss" finding that because the commentary's "intended loss" alternative expanded the definition of loss, it deserves no weight. *Id.*

The same analysis holds true here as application note 4 expands the Guidelines. The

language of the § 3A1.4 text says a 12-level enhancement applies if the defendant's offense "involved, or was intended to promote, a federal crime of terrorism"—defined as an offense that *both* (1) satisfies § 2332b(g)(5)(A)'s motivational element, *and* (2) is a violation of a statute enumerated in § 2332b(g)(5)(B). §3A1.4 n. 1. The plain meaning of the word "and" in § 2332b(g)(5) is conjunctive. *See United States v. Alhaggagi*, 978 F.3d 693, 699 (9th Cir. 2020) ("Both parts of § 2332b(g)(5) must be satisfied for the enhancement to apply."). But application note 4 reads this conjunctive definition out of the guideline, rendering it disjunctive instead. Where a guideline requires the government to satisfy two criteria, an application note necessarily conflicts with the guideline if it permits the government to enhance a sentence based on satisfying only one of those criteria. *See United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018) (explaining commentary is "inconsistent with the Guidelines when following the commentary would violate the dictates of the relevant Guidelines").

Although there appears to be a circuit split on whether both parts of § 2332b(g)(5) must be satisfied for the enhancement to apply, it appears that the D.C. Circuit, in dicta, recognizes that they do. In *United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012), the court acknowledged, "[t]he definition of 'federal crime of terrorism' contains its own intent element, with an additional requirement only that the offense of conviction appear on the statutory list." *Id.* (emphasis added); *accord United States v. Abu Khatallah,* 314 F.Supp. 179, 197 n.19 (D.C.C. 2018) ("The offense must also be enumerated in the statute defining a federal crime of terrorism; damaging federal property and providing material support to terrorists are on the list. 18 U.S.C. § 2332b(g)(5)(B)(i).").

The text of § 3A1.4 is not at all ambiguous as to whether the government must prove both, or only one, of the elements in § 2332b(g)(5)'s "federal crime of terrorism" definition. The

guideline is clear that to qualify as a "federal crime of terrorism," an offense must satisfy *two* criteria: the motivational element and the enumerated-statutes element, and it appears that the D.C. Circuit is inclined to recognize this conjunctive requirement. This text provides no license to apply § 3A1.4 where a defendant's offense involved or was intended to promote a crime that *either* (1) satisfies the motivational element *or* (2) is a violation of an enumerated statute.

Moreover, application note 4 conflicts with the legislation directing promulgation of §3A1.4. The two statutes from which § 3A1.4 and the term "Federal crime of terrorism" are derived are the Violent Crime Control and Law Enforcement Act of 1994 (Violent Crime Control Act), Pub. L. 103-322, Title XII, § 120004 and Sections 703 and 730 of the Antiterrrorism and Effective Death Penalty Act of 1996, (AEDPA), Pub. L. 104-132, 110 Stat. 1214. The final form of what was enacted into law as the AEDPA is in Senate Bill 735 which was amended in the House of Representatives as S. 735 Effective Death Penalty and Public Safety Act of 1996 (Engrossed House Amendment). The Conference Report on S. 735, 142 Cong. Rec. H. 3305-01, stated as to Section 730,

> Directions to Sentencing Commission:
>
> Section 730-Senate recedes to House amendment sections 206 and 207. This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines, to apply only to federal crimes of terrorism as defined in section 2332b(g). In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism. *This section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element* to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law.

(Emphasis added).

Section 730 reads:

> The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism *only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code*.

(Emphasis added).

This statutory language and history also lead to the conclusion that a conviction of one of the enumerated offenses listed in § 2332b(g)(5) is a condition for applying §3A1.4. Congress elected not to include § 1512(c)(2) and § 1512(k) in the list of federal crimes of terrorism. The Court should honor that legislative judgment.

In any case, no evidence at trial established, by clear and convincing evidence (the standard for §3A1.4), that Martinez intended by his presence on the Capitol Grounds to "influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." § 2332b(g)(5)(A). If standing around and protesting outside the Capitol Building in a large crowd were factually sufficient to satisfy the terrorism enhancement, Class B misdemeanors would turn into life sentences.

**There is no other basis for an upward departure.** Nor should the Court depart upward based on U.S.S.G. §§5K2.7 and 5K2.14.

Section 5K2.7 applies if "the defendant's conduct resulted in a significant disruption of a government function . . .Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as . . obstruction of justice; in such cases interference with a government function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference." §5K2.7. This guideline is not satisfied here for many reasons.

First, the guideline requires a factual causal connection between *the defendant*'s conduct and the significant disruption of a government function.  That is evident from the rule's use of the phrase "resulted in." *E.g.*, *United States ex rel. Morsell v. NortonLifelock, Inc.*, 651 F. Supp. 3d 95, 186 (D.D.C. 2023) (To say that "a defendant's conduct resulted in . . . [the] harm" is to say that it is the "[a]ctual cause, also called cause-in-fact or factual cause," in contrast to proximate or legal cause).  There is no evidence whatsoever that Martinez himself was a cause-in-fact of the joint session's recess on January 6.  Indeed, Martinez did not even enter the Capitol Building, unlike hundreds or thousands of others.  By the time he climbed the steps outside the building, the joint session had already recessed.

Second, the guideline explicitly states that an upward departure is not ordinarily justified where the offense of conviction is obstruction of justice.  Of course, that is Martinez's relevant offense of conviction here and (assuming arguendo that the government has properly charged a § 1512(c) offense) the Guidelines already "reflect the appropriate punishment for such interference." §5K2.7.

Finally, the timing of §5K2.7's application here would carry an appearance of impropriety.  Hundreds of Capitol riot defendants have been sentenced in the past three years.  But it was only after the *Brock* decision that the government (and Probation Office) began to contend that this upward departure provision applies in § 1512(c) cases.  Thus, its application here would convey the appearance of an end-run around a decision of the D.C. Circuit, not a bona fide departure based on the law and facts.

The same considerations counsel against departing upward under §5K2.14.  No evidence established that Martinez himself "significantly endangered" "national security, public health, or safety." He had no physical interactions with law enforcement officers.  He did not enter the

Capitol Building.  To the defense's knowledge, no judge in this district has applied this departure in a January 6 case.  This case is not appropriately the first.

## IV.     Martinez should receive the zero-point offender adjustment

Because Martinez has zero criminal history points, his total offense level should be adjusted downward by two levels.  U.S.S.G. §4C1.1.

The PSR assesses that because Martinez "possessed a dangerous weapon (bear spray) in connection with the offense," he is disqualified from the adjustment under §4C1.1(a)(7).  PSR, ¶ 102.  That is erroneous.

Although the evidence appeared to show that Martinez had a can of spray in one of his pants pockets on January 6, no evidence established that he ever took the object into his hands. There is no evidence that he brandished the spray, much less that he used it.  There was no evidence indicating that law enforcement officers could observe the spray inside Martinez's pocket.  Thus, while it is true that Martinez "possessed" spray, there is no showing that he possessed it "in connection with the offense," i.e., the effort to disrupt the joint session of Congress.  No evidence proved that this spray was part of a plan to disrupt Congress, as opposed to serving as a defense against real or perceived counter-protesters.

Finally, even the Probation Office declined to find that Martinez was disqualified from the adjustment on the ground that the defendant "use[d] violence or credible threats of violence in connection with the offense."  §4C1.1(a)(3).

## V.     The § 3553(a) factors favor a sentence within the properly calculated range

### A.     The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))

A number of considerations under § 3553(a)(1) warrant a sentence within the properly calculated Guidelines range in Martinez's case: (1) even though the Court has accepted the

government's novel § 1512(c)(2) charge, which drives the sentencing range, the question is at least a close one, meriting leniency in sentencing if not lenity; (2) Martinez did not even enter the Capitol Building; (3) first-time offender status and atypical conduct; (4) his sincere remorse.

###    1.    Leniency is warranted on the novel § 1512(c)(2) charge

Along with most judges in this district, this Court has declined to dismiss the government's novel § 1512(c)(2) charge.  However, it would probably agree that, at the least, the question is a close one.  After all, the Supreme Court will be hearing oral argument next week regarding whether the charge is validly applied in the Capitol riot cases.  *Fischer v. United States*, No. 23-5572, 2023 WL 8605748 (Dec. 13, 2023).

At least three judges in this circuit—including two on the court of appeals—have found that the government's evidence-free interpretation of the obstruction-of-justice offense is "breathtakingly" overbroad.  *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023); *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022).  Even the panelist who authored *Fischer*'s lead opinion acknowledged that before January 6 no court had applied § 1512(c)(2) to acts of protest not intended to affect the integrity or availability of evidence.  *Fischer*, 64 F.4th at 338.

The Court has heard argument that applying a novel construction of a criminal statute to conduct that occurred before any court's adoption of the new interpretation can amount to a due process violation akin to an ex post facto law.  *United States v. Lanier*, 520 U.S. 259, 264 (1997) (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964)).  A fortiori, then, if such a novel charge is still permitted, leniency is certainly appropriate.  Even if he had reviewed the relevant statute on the morning of January 6, Martinez could not have known that what he was doing constituted a novel obstruction-of-justice offense, the first in Chapter 73 that has no nexus to evidence or an investigation.  The point is not that ignorance of the law is an excuse.  The point

is that even if we posit a public that is aware of Section 1512(c), it could not have been fairly warned of a future interpretation of the statute that decouples the crime from evidence and investigations for the first time in its 20-year history.

### 2.    Martinez did not enter the Capitol Building

Unlike the vast majority of Capitol riot defendants charged under § 1512(c)(2), Martinez did not enter the Capitol Building on January 6.  There was no evidence suggesting that, prior to January 6, Martinez planned to enter the building.  This is a significant reason to sentence within the properly calculated Guidelines range.

The fact that perhaps 90% or higher of § 1512(c)(2) defendants entered the Capitol that day demonstrates that the government itself regards such conduct as more serious and harmful than entry onto the Capitol Grounds.  And the D.C. Circuit has recently emphasized that while the Capitol Grounds are a public forum for First Amendment purposes, the inside of the Capitol is not.  *United States v. Nassif*, __ F. 4th __, 2024 U.S. App. LEXIS 8471 (D.C. Cir. Apr. 9, 2024).

To repeat, no trial evidence showed that Martinez's presence outside the building was a cause-in-fact of the joint session's recess.  That cannot be said of hundreds of protester-defendants—many of them misdemeanants—who did enter the building.

### 3.    First-time offender and atypical conduct

The fact that Martinez is a first-time offender, and that the offense conduct is atypical for him, is an appropriate basis for a downward variance.  *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-month range to below the calculated Guidelines range was reasonable and permissibly took into account the defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d 1142, 1143

(10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Martinez's lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis. *See United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

### 4.      Martinez's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance. *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Martinez is earnestly remorseful for his misconduct on January 6. In his allocution, he will apologize to law enforcement and members of Congress and their staff. That Martinez challenged the application of § 1512(c) here does not reveal a lack of remorse. The Guidelines recognize the point. U.S.S.G. §3E1.1 cmt. n. 2 (recognizing that defendants can still receive an acceptance of responsibility reduction where they go to trial to "challenge [] the applicability of a statute to his conduct").

### B.      Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of

similar conduct." § 3553(a)(6).  Sentencing Martinez to more than one year and a day of incarceration would create unwarranted sentence disparities along several levels.

Consider the case of **Matthew Wood**.  Wood was convicted of the obstruction offense of which Martinez was found guilty.  *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), Gov't Sentencing Mem., ECF 55, p. 46.   Wood's conduct, however, was far more severe than Martinez's.  Before January 6, Wood vowed to "raid Congress" and "be brave heart in that bitch." *Id.*, p. 2.  Terrifyingly, he compared his red car to "the blood I will shed" in D.C.  *Id.*, p. 60.

Wood was one of the first rioters in the building and one of the last to leave.  *Id.*  In contrast to Martinez's zero minutes in the building, Wood remained inside for 80 minutes.  *Id.*, p. 59.  Unlike Martinez, Wood was constantly encouraging other rioters to enter the building and breach barricades.  *Id.*

Wood received a sentence of 36 months' probation with 12 months of home detention. *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), ECF 65.  Sentencing Martinez to a term of incarceration longer than one year and a day would create an unwarranted disparity with Wood.

Or consider **William Isaacs**.  Isaacs was not only a key member of the Oath Keepers militia, he was also convicted of conspiring to violate § 1512(c), just like Martinez.  *U.S. v. Isaacs*, 21-cr-28-APM (D.D.C. 2021).  Plainly, the conduct of the Oath Keepers, many of whom were found guilty of seditious conspiracy, was far more serious than Martinez's.  Isaacs was sentenced to 60 months' probation, 500 hours of community service, and 18 months of home confinement.  Sentencing Martinez to a term of incarceration longer than one year and a day would create an unwarranted disparity with Isaacs.

17

A number of  § 1512(c) defendants have been sentenced to terms of incarceration between eight and 10 months.  *U.S. v. Morrison*, 21-cr-334-TJK (8 months); *U.S. v. Puma*, 21-cr-454-PLF (9 months); *U.S. v. Hodgkins*, 21-cr-188-RDM (8 months); *U.S. v. Michetti*, 21-cr-232-CRC (9 months); *U.S. v. Stottlemyer*, 21-cr-334-TJK (8 months); *U.S. v. Weeks*, 21-cr-247-TFH (10 months).  But, again, the conduct of these defendants was far more severe than Martinez's:

**Morrison**:  Unlike Martinez, Morrison entered sensitive areas of the Capitol, including the Speaker of the House's Suite and Senate Chamber; rifled through desks and took pictures of their documents; remained in the Capitol for an hour; and lied to FBI agents.  *U.S. v. Morrison*, 21-cr-334-TJK, ECF 106, p. 2.

**Puma**: Unlike Martinez, Puma planned on "storming the House of Representatives"; scaled a wall and climbed through a broken window to enter the Capitol; entered Senator Merkley's office and smoked marijuana there; promised future violence.  *U.S. v. Puma*, 21-cr-454-PLF, ECF 55, pp. 2-3.

**Hodgkins:** Unlike Martinez, Hodgkins "entered the Capitol wearing a backpack containing protective eye goggles, rope, and white latex gloves. . ." He entered the Senate chamber and took celebratory photographs. *U.S. v. Hodgkins*, 21-cr-188-RDM, ECF 32, p. 4.

**Michetti:** Unlike Martinez, Michetti explicitly stated that his goal in entering the Capitol was to "stop the vote." Michetti confronted law enforcement officers in the building.  He refused to leave the building until he was tear gassed multiple times.  *U.S. v. Michetti*, 21-cr-231-CRC, ECF 46, p. 1.

**Stottlemyer:** Unlike Martinez, Stottlemyer entered sensitive areas of the Capitol, including the Speaker of the House's Suite and Senate Chamber; rifled through desks and took pictures of their documents; remained in the Capitol for an hour.  *U.S. v. Stottlemyer*, 21-cr-334-

18

TJK, ECF 105, p. 2.

*Weeks*: Unlike Martinez, Weeks planned on invading the Capitol.  Weeks climbed a wall and personally overturned bike racks to breach the Capitol.  He waved other rioters into the building.  *U.S. v. Weeks*, 21-cr-247-JDB, ECF 96, p. 2.

Thus, if anything, Martinz's sentence should be milder than the sentences of these defendants.

Finally, a term of incarceration longer than a year and a day would create unwarranted disparities between Martinez's sentence and sentences imposed on parading/demonstrating misdemeanants in January 6 cases.  The distinction between the novel § 1512(c) offense and a Class B parading misdemeanor is one without material legal significance.  If one "demonstrates" or "parades" in the Capitol (40 U.S.C. § 5104(e)(2)(G)) during an "official proceeding," one cannot avoid "influenc[ing]" that proceeding in some manner, or at least that is one's attempted object.  § 1512(c)(2).  But those charged under Section 1512(c)(2) and who therefore allegedly acted with an "unlawful purpose" (the government's definition of "corruptly," satisfied by any trespass or parading charge, according to the government) shared that purpose with the misdemeanants who "demonstrated" or "paraded" against electoral vote certification in the Capitol.

Consider this Court's sentences in parading cases, in which virtually every defendant entered the Capitol, unlike Martinez: *United States v. Morgan-Lloyd*, 21-cr-164-RCL (26 months' probation); *United States v. Wickersham*, 21-cr-606-RCL (3 months' home detention); *United States v. Smith*, 23-cr-6-RCL (30 days' home detention); *United States v. Kuecken*, 23-cr-6-RCL (30 days' home detention); *United States v. Traugh*, 23-cr-212-RCL (45 days' home detention); *United States v. Scavo*, 21-cr-254-RCL (60 days' incarceration); *United States v.*

*McAuliffe*, 21-cr-608-RCL (60 days' home detention); *United States v. Little*, 21-cr-315-RCL (60 days' incarceration); *United States v. O'Brien*, 21-cr-633-RCL (3 months' incarceration); *United States v. Hemphill*, 21-cr-555-RCL (60 days' incarceration); *United States v. Mazzio*, 21-cr-214-RCL (60 days' incarceration); *United States v. Uptmore*, 21-cr-149-RCL (30 days' incarceration); *United States v. Lammons*, 22-cr-103-RCL (30 days' incarceration); *United States v. Miller*, 22-cr-191-RCL (30 days' incarceration); *United States v. Steiner*, 22-cr-191-RCL (30 days' incarceration); *United States v. Mott*, 21-cr-464-RCL (30 days' incarceration); *United States v. Armstrong*, 22-cr-45-RCL (14 days' incarceration).

Expanding the view to all parading cases, in many instances the conduct of these probationary misdemeanants was more disruptive than Martinez's.  Here are some examples:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |

| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
|---|---|---|---|
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |

| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
|---|---|---|---|
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |

22

| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
|---|---|---|---|
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

In short, sentencing Martinez to a term of incarceration longer than one year and a day would create dozens or even hundreds of unwarranted sentence disparities.

## C.    The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

Martinez is a fifty-year-old father of three small children with no criminal history. Those biographical facts alone imply he is highly unlikely to recidivate. *Recidivism Among Federal Offenders*: *A Comprehensive Overview*, U.S. Sentencing Commission, Mar. 2016, p. 23, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (defendants older than 50 at sentencing have a rearrest rate lower than 22%). Prior to January 6, nonviolent demonstrators at the Capitol who violated relevant law were typically penalized under a process called "post and forfeit": they paid to have their demonstration-related case dropped for approximately $25-100. ACLU, District of Columbia, Demonstrations in D.C., available at: https://www.acludc.org/en/know-your-rights/know-your-rights-demonstrations-dc. That was deemed sufficient deterrence. In contrast, Martinez was charged with multiple felony offenses in federal court. FBI agents came to his home. A lengthy sentence of incarceration—along with its destabilizing effect on his family—is not needed to deter Martinez from protesting at the Capitol again without authorization. Together with scathing media criticism and social ostracization, a federal conviction— as well as a sentence of one year of incarceration—will well and truly deter Martinez. The heavy shame Martinez has experienced is itself a guarantee of deterrence. *See, e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions"); *United States v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

**Conclusion**

For all the foregoing reasons, Martinez respectfully requests a sentence of 12 months and a day of incarceration, 200 hours' community service, and $2,000 in restitution.

Dated: April 12, 2024                    Respectfully submitted,

                                        */s/ Nicholas D. Smith*
                                        Nicholas D. Smith (D.C. Bar No. 1029802)
                                        1123 Broadway, Suite 909
                                        New York, NY 10010
                                        Phone: (917) 902-3869
                                        nds@davidbsmithpllc.com


                                        *Attorney for Tony Martinez*

## **Certificate of Service**

    I hereby certify that on the 12th day of April, 2024, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

    And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].


                                        */s/ Nicholas D. Smith*
                                        Nicholas D. Smith (D.C. Bar No. 1029802)
                                        1123 Broadway, Suite 909
                                        New York, NY 10010
                                        Phone: (917) 902-3869
                                        nds@davidbsmithpllc.com


                                        *Attorney for Tony Martinez*